THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| TRINITY HEALTH-MICHIGAN, IHA HEALTH SERVICES CORPORATION d/b/a TRINITY HEALTH IHA MEDICAL GROUP, TIMOTHY HENNE, M.D., TIMOTHY LENTERS, M.D., JOHN (JACK) HEALEY, M.D. and GEOFFREY SANDMAN, M.D., | Civil Action No. |
| Plaintiffs, | |
| | **COMPLAINT FOR DECLARATORY JUDGMENT AND DAMAGES** |
| v. | **DEMAND FOR JURY TRIAL** |
| ORTHOPAEDIC ASSOCIATES OF GRAND RAPIDS, P.C. d/b/a ORTHOPAEDIC ASSOCIATES OF MICHIGAN, | |
| Defendant. | |

Plaintiffs Trinity Health-Michigan ("THM"), IHA Health Services Corporation d/b/a Trinity Health IHA Medical Group ("IHA") and Drs. Timothy Henne, Timothy Lenters, John (Jack) Healey and Geoffrey Sandman bring this action against Defendant Orthopaedic Associates of Grand Rapids, P.C. d/b/a Orthopaedic Associates of Michigan ("OAM"), based on the following allegations:

<u>**INTRODUCTION**</u>

1.     This Complaint is filed to seek damages and declaratory relief against anticompetitive and monopolistic behavior by OAM, which will seriously disrupt care for patients needing orthopedic surgery in Kent County. OAM is by far the dominant orthopedic group in Kent County. It was formed by mergers with other orthopedic groups, thereby eliminating much of the competition in this market.

2.     OAM has engaged in a pattern and practice of unjustified enforcement of its noncompetition clauses to force physicians unhappy with its operations to leave Kent County,

thereby significantly reducing the availability of orthopedic surgeons in Kent County and also significantly reducing competition among Kent County orthopedic surgeons and hospitals. Including the Plaintiffs, OAM has now taken this action against at least eight different physicians. All of these physicians, who had previously worked at River Valley Orthopedics ("RVO"), had focused their practices at Trinity Health Saint Mary's Hospital ("Saint Mary's"), a division of Plaintiff THM. OAM's actions had the effect of, and were intended to, not only reduce competition for OAM in professional orthopedic surgery services, but also to harm Saint Mary's. OAM has sought to use these noncompetition clauses, not to prevent unfair competition (as the law permits), but to squelch any competition.

3.      OAM is currently insisting on compliance with its unlawful noncompetes by four physicians who have recently provided notice of their resignation from its practice, Plaintiffs Timothy Henne, M.D., Timothy Lenters, M.D., John (Jack) Healey, M.D., and Geoffrey Sandman, M.D. All these physicians desire to continue practicing in Kent County as employees of THM's affiliate IHA and to continue working at Saint Mary's. Enforcement of these noncompetes would essentially destroy these physicians' practices and deprive their patients of care from the doctors they have chosen.

4.      Because Drs. Henne, Lenters, Sandman and Healey perform the majority of orthopedic surgeries at Saint Mary's, enforcement of the noncompetes would also dramatically reduce Saint Mary's ability to provide orthopedic surgery to the many patients who seek to use that hospital and the many referring physicians (such as primary care physicians) who prefer that their patients receive surgery at Saint Mary's. Enforcement would therefore seriously impede competition in the provision of hospital orthopedic services since it would dramatically weaken

2

competition from Saint Mary's, one of only two alternatives to the dominant Corewell Health in the provision of hospital orthopedic services in Kent County.

5.      These actions would seriously disrupt Saint Mary's ability to continue its orthopedic surgery residency program. They would also interfere with orthopedic emergency care for many patients, and cause significant delays in the ability of patients to receive orthopedic care.

6.      OAM took these actions only in order to maintain its monopoly power, and to disrupt competition at Saint Mary's, since OAM's MidTowne orthopedic surgery facility competes with Saint Mary's and the Southwest Surgery Center in which THM owns a majority interest. OAM has forced (and intends to force) all the former RVO doctors to leave the market, even though there was no reasonable basis for OAM to be concerned about unfair competition from these physicians, and therefore no reasonable basis for application of the noncompetition clauses.

7.      OAM has also taken a number of additional anticompetitive actions to harm Saint Mary's. In July, 2022, at a meeting with Drs. Burgess and Easton, the President and Vice President of OAM, Dr. Matthew Biersack, president of Saint Mary's, informed them that THM would be employing orthopedic surgeons to work at Saint Mary's because of OAM's failure to cooperate with the hospital. In response, Drs. Easton and Burgess became furious, alarmed at the prospect of facing additional competition in the market. Dr. Easton slammed his hand down on the table. He indicated that if Saint Mary's took that step, OAM would cease providing on-call services at Saint Mary's and would cease working with Saint Mary's on its orthopedic residency program. Subsequently, OAM gave Saint Mary's notice of termination of the on-call contract between the parties, effective March 17, 2023.

3

8.      The termination of the on-call agreement, coupled with enforcement of the noncompetition clauses against Drs. Henne, Lenters, Sandman and Healey, would significantly interfere with Saint Mary's ability to provide emergency care to patients seeking orthopedic surgery services on an emergency basis at the hospital. Many patients seeking emergency orthopedic surgery could face being turned away by Saint Mary's. Most of those on-call services today are being provided by Drs. Henne, Lenters, Sandman and Healey.

9.      Additionally, OAM's spine surgeons cut back substantially on the cases they performed at Saint Mary's, even though they found Saint Mary's facilities to be highly suitable to their practices. These actions were taken in order to retaliate against THM for attempting to compete with OAM, and to deter such competition. These actions caused and are continuing to cause substantial damage to THM.

10.     After failed "buyout" negotiations, THM and IHA determined that IHA needed to go forward and employ these physicians notwithstanding the parties' dispute with OAM. IHA therefore entered into employment contracts with Drs. Henne, Lenters, Healey and Sandman, effective March 17, 2023.

11.     This Complaint seeks a declaratory judgment that the noncompetition provisions in OAM's employment contracts are unenforceable and void, that Drs. Henne, Lenters, Sandman and Healey may continue to work in Grand Rapids and at Saint Mary's and that OAM's actions have violated federal and state antitrust laws. Plaintiffs also seek both past and continuing damages for OAM's violations.

## THE PARTIES

12.     Plaintiff THM is a Michigan nonprofit corporation and a subsidiary of Trinity Health. THM owns and operates, among other facilities in Michigan, Trinity Health Saint Mary's ("Saint Mary's") in Grand Rapids.

4

13.     Plaintiff IHA is also a subsidiary of Trinity Health. IHA employs physicians in various specialties, including orthopedics. IHA does not currently employ any orthopedic surgeons in western Michigan.

14.     Drs. Timothy Henne, Timothy Lenters, John (Jack) Healey and Geoffrey Sandman are orthopedic surgeons practicing in Kent County, Michigan.

15.     Saint Mary's is a hospital in Grand Rapids, Michigan. Saint Mary's offers a variety of inpatient and outpatient services, including cardiology, neurology, surgery, obstetrics, critical care services, and (of particular relevance here) inpatient and outpatient orthopedic surgery.

16.     Saint Mary's provides extremely high quality health care services to its patients, in particular in orthopedics. Saint Mary's received an "Outstanding Patient Experience" award from Healthgrades, and has been awarded five stars for its performance in total hip replacements by Healthgrades. It was named a "Top 100 Hospital" by IBM Watson Health/Truven Health Analytics. Saint Mary's is a Blue Cross Blue Shield of Michigan "Blue Distinction Center+" for Spine Surgery and Knee and Hip Replacement. It has been identified as "high performing" in hip replacement surgery, knee replacement surgery, hip fracture surgery, and spine and back surgery by U.S. News & World Report. It is certified by the Joint Commission on Accreditation of Hospitals for hip, knee and shoulder surgery.

17.     Defendant Orthopaedic Associates of Grand Rapids, P.C. refers to itself as Orthopaedic Associates of Michigan ("OAM"). OAM states on its website that it is "west Michigan's most established Orthopaedic practice" and "the most comprehensive independent provider of Musculoskeletal care in the region . . ." OAM's services include a bone health clinic, an urgent orthopedic care clinic, and an outpatient surgery center at its MidTowne facility.

18.     According to its website, OAM includes 29 orthopedic surgeons and four other physicians in related specialties as well as 23 nurse practitioners and physician assistants. OAM operates through three physicians' offices in the Grand Rapids metropolitan area as well as one office in Greenville. OAM is by far the largest orthopedic surgical practice in Kent County.

19.     Orthopedic surgeons can be employed by a hospital or affiliate of a hospital, or can operate in a group, like RVO or OAM, that is independent of the hospital. In either event, such physicians need to admit patients to hospitals or other facilities in order to perform their surgeries. The hospitals and other facilities derive revenues from the performance of those surgeries. Therefore, it is critical for any hospital wishing to perform orthopedic surgery to have relationships with physicians, whether or not they are independent of the hospital, who wish to utilize the hospital services for their surgeries.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1367; Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26; and Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1 and § 2. This Court has exclusive jurisdiction over the claims in this case brought pursuant to the Sherman Act and Clayton Act.

21.     OAM transacts business in this district and is subject to personal jurisdiction therein. OAM has maintained its principal place of business in this district, resides in this district and is found in this district. The actions complained of herein and giving rise to this Complaint took place in this district. THM has maintained a significant place of business in this district at, among other locations, its Saint Mary's facility, and THM and IHA have suffered the bulk of their damages in this district. Venue is proper in this district pursuant to 15 U.S.C. §§ 15, 22, and 26 and 28 U.S.C. § 1391.

## TRADE AND COMMERCE

46410094.36

22.     OAM is engaged in interstate commerce and its activities substantially affect interstate commerce. Millions of dollars of OAM's revenues (including millions of dollars of revenues involved in treating patients at Saint Mary's or referred by Trinity Health West Michigan Medical Group physicians and at least hundreds of thousands of dollars of revenue) involved in treating patients by Drs. Henne, Lenters, Sandman and Healey come from sources located outside of Michigan, including payments from out-of-state commercial and Medicare Advantage payors such as Aetna, Cigna, Humana and United. OAM treats a significant number of patients (representing at least hundreds of thousands of dollars of payments) from other states, including emergency cases involving patients who reside in other states but are visiting western Michigan.

23.     THM (and in particular Saint Mary's) receives millions of dollars of revenue from sources located outside of Michigan, including payments from out-of-state commercial and Medicare Advantage payors, such as Aetna, Cigna, Humana and United, both generally and for orthopedic services. The revenues for orthopedic services specifically received from these national payors equaled almost $2,000,000 in 2022. The same is true of IHA. Trinity Health (THM's and IHA's parent) also borrows hundreds of millions of dollars from lenders in interstate commerce through its bond offerings, which are used to benefit, among others, Saint Mary's.

24.     THM (including Saint Mary's), IHA and OAM also spend millions of dollars on the purchase of supplies in interstate commerce, including, most relevant to this case, surgical supplies and instruments, drugs used for anesthesia, and anesthesia machines and other equipment.

25.     OAM's actions described below threaten a substantial reduction in competition in the relevant antitrust markets described below, which would substantially affect payments made

7

in interstate commerce by commercial payors to the parties, as well as payments made to the parties by out of state patients and payments made by the parties in interstate commerce, in amounts in the millions of dollars.

### FACTUAL ALLEGATIONS

### The Conduct of the Parties

### OAM

26.     OAM has a dominant market share in the provision of orthopedic surgical professional services in Kent County. OAM's share of orthopedic surgery cases, based on data reported by the State of Michigan, is approximately 64%. OAM has only one significant competitor, Spectrum Health Medical Group, with a 23% share. There are no other significant competitors; a few small groups have shares under 7%. The shares are similar when measured by numbers of physicians. OAM employs by far the most orthopedic surgeons in Kent County.

27.     OAM's share is even more dominant (more than 85%) with respect to patients who seek to utilize Saint Mary's or UM Health West, and for patients whose physicians do not practice at Corewell Health (formerly Spectrum) hospitals. That is because Spectrum Medical Group orthopedic surgeons practice exclusively at Corewell.

28.     As a result of its market dominance, OAM is a "must have" physician group for any managed care plan seeking to successfully sell its products to employees in the Kent County area. As a result, OAM has the power to demand significantly higher rates for its services, and to increase healthcare prices.

29.     OAM has gained its dominant position, not through internal expansion or effective competition, but by merger. OAM explains on its website that it is the product of a merger of four different orthopedic groups. Most recently, OAM acquired River Valley

Orthopedics ("RVO") in 2018. That transaction added nine physicians to OAM's roster, and eliminated OAM's second largest competitor.

### OAM Alienated the Former RVO Physicians

30.      OAM is highly inefficient, with the majority of physician revenues necessary to cover unusually high overhead costs. Additionally, it is very difficult to attract new physicians to OAM because of the low levels of compensation OAM is able to pay new physicians because of its inefficiencies. This has made the practice significantly less attractive to physicians practicing at OAM.

31.      RVO orthopedic surgeons have traditionally provided virtually all orthopedic care at Saint Mary's. After the RVO physicians joined OAM, that pattern continued. But OAM has been unable to work well with Saint Mary's. Saint Mary's and OAM have had numerous meetings to try to establish cooperative relationships, but have been unable to do so.

32.      As a result, a number of RVO physicians became dissatisfied with OAM and all of the former RVO physicians have retired, left the OAM practice, or given notice of their intent to do so. Dr. Bryan Pack left in 2020. The physicians who left most recently (in 2022) include Drs. Patthanacharoenphon, Harper and Gilde. All these physicians were subject to noncompetition clauses in the form described below. Because of OAM's noncompetition clauses prohibiting them from practicing within a 50 mile radius of their prior practice, these physicians all found it necessary to leave the Kent County area to practice. This was demanded even though all the physicians had built their practices well before going to work for OAM and the noncompetition clauses were unnecessary to protect against any (hypothetical) unfair competition.

33.      These physicians desired to continue practicing in the Grand Rapids area, but were unable to do so, because of their noncompetes. But for OAM's enforcement of the noncompetition clauses, these physicians would likely have remained in the Kent County area,

9

continuing to practice as employees of THM and continuing to perform orthopedic procedures at Saint Mary's. The loss was especially significant, since three of these physicians were fellowship trained in total joint surgery, training that is not possessed by most surgeons in the market. As a result, Saint Mary's and patients in Kent County lost the benefit of their services.

34.     While some of the surgery volume previously performed by these three physicians at Saint Mary's was made up by other OAM physicians, not all of it was. Saint Mary's has lost substantial volumes of business, which will cost it at least $5.8 million annually from lost commercially insured and Medicare Advantage cases as a result of OAM's enforcement of its noncompetition clauses against these four physicians. To date, these damages have equaled at least $2.9 million. These damages will equal at least $17 million over a three year period.

## OAM's Disputes with Saint Mary's

35.     After it acquired monopoly power through its merger with RVO, OAM has made a number of unreasonable, monopolistic demands to Saint Mary's. One related to the agreement for OAM to provide orthopedic surgical "on-call" services to Saint Mary's. "On-call" services contracts provide that physicians will be available to immediately appear at the hospital as needed to treat emergency cases. These arrangements are critical to any hospital, since patients may arrive with emergency conditions that require immediate specialty care. Saint Mary's had utilized OAM to provide on-call orthopedic services at the hospital since OAM acquired RVO in 2018. Prior to that time, RVO had provided these services.

36.     In 2022, OAM demanded a substantial increase in the amount of payment it would receive for these on-call services from $1400 per day to $2300. This figure is far in excess of normal on-call payments in the United States. The median (50th percentile) level of payment for on-call orthopedic surgical care in the United States ranges from $1100 - $1300. The $2300 figure demanded by OAM is well in excess of even the 90th percentile nationally. OAM was able

to make this demand only because its monopolistic position meant that Saint Mary's had no real alternative for these on-call services.

37.     As a result of the departure of Drs. Pack, Harper, Gilde and Patthanacharoenphon and other earlier departures, Saint Mary's became convinced that OAM would be unable to adequately provide orthopedic services at Saint Mary's. The unreasonable demands for payment for orthopedic call and OAM's failures to cooperate with Saint Mary's more generally further convinced Saint Mary's that it would need to employ orthopedic surgeons in order to obtain adequate orthopedic surgical care for its patients at a reasonable cost.

38.     As described above, OAM has retaliated against THM for its decision, attempting to deter THM from employing orthopedic surgeons by giving notice of its intent to cut off "on-call" orthopedic services and ending its services supporting Saint Mary's orthopedic residency.

39.     The loss of orthopedic on-call services will also cause very significant harm to Saint Mary's, its patients and the community. Patients seeking emergency orthopedic services at Saint Mary's (perhaps because of a fracture or other traumatic injury) may need to be turned away to another hospital if Saint Mary's is not able to provide sufficient on-call services for these patients. That problem will be avoided if Drs. Henne, Lenters, Sandman and Healey can continue to work at Saint Mary's, since they can continue to provide the on-call services that were previously provided through the OAM contract. However, if the noncompetition agreement is enforced against them, the termination of the on-call agreement will create serious problems for these patients.

40.     Additionally, a substantial number of Saint Mary's orthopedic surgery cases result from cases that come to the hospital on an emergency basis and go through the emergency department. If Saint Mary's does not possess adequate orthopedic on-call services, it will be

11

forced to transfer these emergency cases to other hospitals and lose these cases. Given OAM's dominant market position, and the unavailability of other orthopedic surgeons to provide orthopedic on-call services at Saint Mary's, this will likely result in a decline in Saint Mary's contribution margin relating to commercially insured and Medicare Advantage inpatient orthopedic surgery cases of at least $4 million annually.

41.     Saint Mary's could also lose its designation as a Level II trauma center if it loses on-call coverage for orthopedic trauma. This would mean that fewer trauma cases would be brought to the hospital, and cause further declines in volume, not only for orthopedic surgery but for other kinds of trauma surgery as well. These are additional damages caused by OAM's monopolistic behavior, and will create a further limitation in services for Kent County patients seeking emergency care.

42.     Commencing in August, 2022, in retaliation for THM's and IHA's plan to compete with OAM and in order to discourage such competition, OAM physicians also dramatically reduced the number of spine surgeries that they performed at Saint Mary's. This was in particular true of Dr. Easton, who is a spine surgeon. The reduction has cost Saint Mary's at least $700,000 in lost contribution margin on inpatient commercial and Medicare Advantage cases in calendar 2022. THM currently estimates that the annualized loss will be at least $1.5 million in inpatient commercial and Medicare Advantage cases.

43.     The termination of the on-call contract, decision not to support the residency program and reduction in the performance of spine cases at THM were contrary to OAM's own self-interest, and made sense only as an effort to harm THM and stifle its competition in the professional orthopedic services market. Dr. Easton, the physician who has most reduced his surgeries at THM, has specifically stated that he very much likes the surgical services department

at Saint Mary's and likes working at Saint Mary's. Dr. Easton and other OAM physicians have conducted spine surgeries at Saint Mary's since at least 2019. Saint Mary's has provided very convenient surgical "block time" for Dr. Easton and the other OAM spine surgeons.

44.     The on-call contract has provided lucrative revenues to OAM, both from THM's direct payments (equaling more than $200,000 per year) and the lucrative orthopedic surgical cases that on-call physicians gain relating to patients seen in the emergency department. OAM has also received more than $100,000 per year for its services relating to Saint Mary's orthopedic residency program.

45.     These actions thus involve a sacrifice of short-term profits with the goal of deterring Saint Mary's from providing professional orthopedic surgical services in competition with OAM in the future.

46.     OAM has also sent notice of termination of its lease of office space with THM at THM's Byron Center offices. OAM's staff has also ceased meeting with Saint Mary's referral coordinators.

**Drs. Henne, Lenters, Healey and Sandman**

47.     Drs. Henne, Lenters, Healey and Sandman are four orthopedic surgeons employed by OAM. These surgeons were earlier employed by RVO and spent all their careers at RVO before RVO merged with OAM. Each of the four physicians built his practice, established a reputation for high quality services and established extensive relationships with patients and primary care physicians who refer cases to orthopedic surgeons, long before joining OAM. Prior to joining OAM, Dr. Healey had been a practicing physician for 22 years, Dr. Sandman for 16 years, and Drs. Henne and Lenters for 13 years each.

48.     Drs. Henne, Lenters, Healey and Sandman honed their skills long before joining OAM. They did not learn any trade secrets from OAM. Upon joining OAM, they continued to

13

practice medicine as they had done earlier in their careers, with practices built on their existing relationships and reputations and not dependent on any trade secrets or confidential information from OAM.

49.     OAM did not compensate Drs. Henne, Lenters, Sandman and Healey when it acquired their practices. Instead, the four physicians were required to buy into the OAM practice.

50.     Drs. Henne, Lenters, Healey and Sandman have, since their tenure at RVO, and for many years preceding their work at OAM, based their practices at Saint Mary's and have had a strong relationship with Saint Mary's.

51.     Since 2021, two orthopedic surgeons with specialized trauma training, Drs. Fras and Miller, have worked for Saint Mary's under a professional services agreement to provide orthopedic trauma care at the hospital. Drs. Fras and Miller also perform a limited number of general orthopedic cases at Saint Mary's. With the exception of Drs. Henne, Lenters, Healey and Sandman, Drs. Fras and Miller are the only physicians regularly performing a significant number of orthopedic surgical services other than spine surgery at Saint Mary's.

**The Noncompetition Clause Affecting Drs. Henne, Lenters, Sandman and Healey**

52.     The employment agreements between Drs. Henne, Lenters, Sandman and Healey and OAM include the following noncompetition provision precluding them from the practicing of medicine within a 50 mile radius for one year after the end of their employment by OAM:

> Employee agrees that, for a period of twelve (12) months following termination of Employee's employment and within fifty (50) miles of any office of the Company at which the Employee has provided patient services within the twelve (12) months prior to termination of Employment, Employee will not, directly or indirectly, render services of a professional nature to any person or firm for compensation, or otherwise engage in any business of the same or similar nature to that carried on by the Company, whether such engagement is as an officer, director, proprietor, employee, partner, investor, consultant, adviser, agent, or otherwise, nor

14

solicit patients, referral sources, employees, or contractual relationships or expectancies of the Company.

53.     Drs. Henne, Lenters, Healey and Sandman have been very unhappy with OAM because of its inefficiencies, its inability to recruit physicians, the fact that it has alienated other physicians who have left and its failure to work well with Saint Mary's.

54.     For these reasons, in September, Drs. Henne, Lenters, Healey and Sandman gave notice of termination of their employment arrangement with OAM, effective March 16, 2023. All these physicians would like to go to work for IHA as employed physicians. However, OAM has insisted on enforcement of its noncompete clause, and has refused to permit them to do so, absent an exorbitant payment by THM and IHA that has nothing to do with the value of these physicians' services to OAM.

55.     OAM's termination of the on-call agreement and threatened non-participation in the residency program were effective threats only because the enforcement of the noncompetes would prevent Drs. Henne, Lenters, Healey and Sandman from performing these services.

**Harm to Saint Mary's from Enforcement of the Noncompete**

56.     Enforcement of the noncompete would devastate Saint Mary's orthopedic program. Since the departure of the other former RVO surgeons from Kent County, Drs. Henne, Lenters, Healey and Sandman have performed the majority of the orthopedic surgery cases at Saint Mary's. OAM has no intention of continuing to perform cases at Saint Mary's after Drs. Henne, Lenters, Healey and Sandman are no longer permitted to practice in the area because of their noncompete clauses. OAM has already directed that these physicians not perform surgeries commencing shortly after the beginning of February, 2023. Currently, surgical suite bookings by OAM in February consist of nine cases by Dr. Sandman and Dr. Healey, and only one case by another OAM physician. No other OAM doctor has scheduled cases at Saint Mary's to replace the

cases performed by Drs. Henne, Lenters, Healey and Sandman. Additionally, Drs. Henne, Lenters, Sandman and Healey provide a significant proportion of the orthopedic surgeries performed at Southwest Surgery Center, which is majority owned by THM.

57.     If OAM is allowed to enforce the noncompete against Drs. Henne, Lenters, Healey and Sandman, Saint Mary's will therefore suffer a loss of substantial numbers of orthopedic cases. This will result in damages through calendar year 2023 of at least $9.6 million in foregone contribution margin from lost commercially insured and Medicare Advantage cases. These damages will continue on an annual basis for at least three years if the noncompetition clause is enforced.

58.     Even more importantly, many patients who desire to receive services from these physicians or from Saint Mary's will be unable to do so. Many referring physicians will be unable to send their patients to their preferred hospital and doctor.

59.     The volume of revenues lost will be quite substantial. Based on the surgeries performed by Drs. Henne, Lenters, Healey and Sandman in second half of calendar year 2022, THM stands to lose cases generating net revenues of $20,000,000 or more on an annualized basis.

60.     The decline in volumes will undoubtedly significantly harm Saint Mary's reputation, and cause further declines. Most of the awards that Saint Mary's has received for orthopedic surgery are predicated on the performance of significant numbers of cases. Many of these awards may not be granted in the event of a significant decline in orthopedic surgical volumes. For example, Saint Mary's could lose its Joint Commission certification for total joint surgery.

61.     As a result of OAM's dysfunction, as of the resignations of Drs. Henne, Lenters, Sandman and Healey, not a single former RVO physician will still be employed by OAM. Each

16

such physician has either retired or resigned from OAM. If the noncompetition clauses are enforced, this will force from the Kent County market all of the physicians who represented the historical patient base for Saint Mary's orthopedic surgical practice.

62.    As a result of these factors, Saint Mary's damages from OAM's actions are likely to be far greater than even the figures described above indicate.

63.    If the noncompete were not enforced against Drs. Henne, Lenters, Healey and Sandman, they could continue to provide on-call orthopedic trauma coverage at Saint Mary's and Saint Mary's could avoid the damages from termination of the on-call agreement with OAM. The enforcement of the noncompete is thus a further cause of these damages.

64.    Enforcement of the noncompete would also interfere with important research done by Dr. Lenters. He is administering a research study and clinical trial involving the use of an intraoperative antiseptic irrigant to reduce infection from shoulder surgery. This research could provide substantial benefits for patients receiving shoulder surgery throughout the world. If Dr. Lenters is forced to leave the community by the noncompete, the study would need to be ended.

**Harm to Orthopedic Residency Program**

65.    Saint Mary's maintains an orthopedic surgical residency program in conjunction with Corewell (formerly Spectrum Health) which trains graduate medical students in orthopedic surgery over a 5-year period. The residents rotate between the Corewell facilities and Saint Mary's. The residents perform essential functions at Saint Mary's, including staffing surgeries, assisting the trained surgeons, and are on call at all hours to respond to patient concerns at the hospital and address emergencies. They also administer the call schedules at Saint Mary's and help administer the hospital's surgical schedules, subject to the supervision of the trained surgeons. Additionally, senior orthopedic residents supervise family medicine residents' orthopedic graduate medical education.

17

66. OAM has been paid for these services, and has never claimed that the payment was inadequate.

67. The orthopedic residents, supervised by Drs. Henne, Lenters, Sandman and Healey, also staff an outpatient orthopedic clinic at the Trinity Health Academic Specialty Medicine – Grand Rapids Campus, also referred to as the Wege Clinic. The Wege Clinic provides orthopedic services to "safety net" patients who are either uninsured or underinsured.

68. Like any residency program, it is critical that the residents be supervised and trained by orthopedic surgeons with significant skills who can provide the residents with "hands on" experience in a wide range of orthopedic surgery cases. The residency program is administered and staffed primarily by Drs. Henne, Lenters, Sandman and Healey. They do an outstanding job of operating and administering the program. Dr. Henne is the Site Director and Associate Program Director for the program. This specialty work was previously performed for many years by physicians at River Valley Orthopedics including Drs. Henne, Lenters, Healey and Sandman.

69. If the noncompete is enforced, and the four physicians can no longer practice at Saint Mary's, the orthopedic residency program will be crippled, because it will be unable to proceed without Drs. Henne, Lenters, Sandman and Healey. This will also likely limit or eliminate the availability of orthopedic care to the underserved at the Wege Clinic. OAM has made this clear by Dr. Easton's statement that OAM would no longer staff the orthopedic residency program.

70. If the orthopedic residency program at Saint Mary's were ended, that would make it even more difficult for Saint Mary's to recruit new orthopedic surgeons to Kent County. Residents are critical in providing supplemental care and relieving the day-to-day burden of

orthopedic surgeons. Orthopedic surgeons are far less likely to agree to practice at a hospital where they do not have the assistance of orthopedic residents. Preventing such recruitment was another objective of OAM in refusing to staff the residency program, since it would reduce further competition for OAM.

71.     If the orthopedic residency program failed at Saint Mary's, that would also cost Saint Mary's substantial funds, since it receives payment from Medicare for its participation in this residency program.

72.     Saint Mary's has suffered total damages to date from OAM's anticompetitive actions of at least $3.6 million, and will suffer at least $11 million of damages annually if its past anticompetitive actions continue, equaling at least $33 million over three years. As described above, additional damages of at least $9 million annually and $28 million over three years would accrue if Drs. Henne, Lenters, Healey and Sandman were prevented from working for IHA in Kent County. These figures do not include additional damages due to lost ancillary services as a result of lost surgeries.

**OAM's Anticompetitive Intent**

73.     Saint Mary's and IHA are direct targets of all of OAM's actions. OAM intended to enforce the noncompete in order to prevent IHA and others from challenging its market dominance in the relevant professional orthopedic services markets. The harm to Saint Mary's hospital was inextricably intertwined with this injury. OAM's actions in reducing its surgeons' use of Saint Mary's, terminating the on-call agreement with Saint Mary's and threat to cease support for Saint Mary's residency program were intended to deter Saint Mary's and IHA from entering the competition with OAM.

74.     OAM operates its own outpatient orthopedic surgery center. While this center is not in any of the relevant markets, it does compete directly with Saint Mary's and Southwest

19

Surgery Center, owned in part by THM. Therefore, OAM stands to gain to the degree if Saint Mary's loses surgeries. OAM's actions to enforce its noncompetition provisions against all of its dissatisfied physicians who had practiced at Saint Mary's were motivated by a desire to harm Saint Mary's and reduce the number of surgeries performed by Saint Mary's.

75.     OAM is only taking its anticompetitive actions because its monopoly power gives it the ability to make these actions effective, and that same monopoly power gives it the incentive to take action in order to prevent further competition. In particular:

a.      OAM's termination of its on-call agreement was effective as retaliation against THM only because of the limited alternative sources of orthopedic surgical services in the Kent County market resulting from OAM's dominant share. The same is true of OAM's statement that it would no longer staff the orthopedic residency program at Saint Mary's. OAM would not have had an incentive to take these actions if they did not threaten its monopoly power.

b.      OAM would not be in a position to attempt to enforce noncompetes against all the orthopedic surgeons who have worked at Saint Mary's had OAM not engaged in its merger with RVO in violation of the antitrust laws.

76.     OAM's executive staff has specifically expressed concern about direct competition between OAM and Saint Mary's, both with regard to its physicians' practices and its surgery center. OAM has stated that Trinity is "gearing up" to compete more significantly, and has expressed concern about Trinity's orthopedic center of excellence.

**The Immediate Dispute**

46410094.36

77.     Saint Mary's repeatedly attempted, but failed, to reach an accommodation with OAM which would allow it to employ Drs. Henne, Lenters, Sandman and Healey without any dispute regarding the applicability of the noncompetition provision. However, OAM refused to provide all the information requested by THM's consultant, Huron Consulting, to allow it to value these doctors' practices. OAM refused to provide any financial information at all to THM which would allow it to make its own assessment of the value of those practices. THM then offered a payment to OAM in exchange for a waiver of the noncompetes in order to avoid any dispute. That offer was rejected and OAM stated that it would not provide a counteroffer.

78.     Effective at the beginning of February, surgeries at Saint Mary's by Drs. Henne, Lenters, Sandman and Healey will cease, as a result of OAM's demand that these doctors cease surgeries well in advance of their resignation date of March 16. No other OAM doctors have scheduled surgeries at Saint Mary's in their place. As a result, Saint Mary's faces a very serious shortfall in surgeries commencing in the immediate future.

79.     Because they have no opportunity to perform surgeries after the beginning of February, Drs. Henne, Lenters, Sandman and Healey also face the prospect of having essentially no income commencing at the beginning of February. Nevertheless, under their agreement with OAM, these physicians are required to pay their share of OAM's overhead expenses for at least February and the first half of March, until their resignation is effective.

80.     THM and IHA Health Services Corporation, d/b/a Trinity Health IHA Medical Group ("IHA") have therefore entered into employment agreements with Drs. Henne, Lenters, Sandman and Healey in order to secure the provision of surgical services at the hospital and avoid serious gaps in care for Saint Mary's patients.

46410094.36

81.     This has resulted in a significant and actual controversy and dispute between OAM on the one hand and THM, IHA and Drs. Henne, Lenters, Sandman and Healey on the other, regarding the validity of the noncompetition clauses. Plaintiffs face the risk of claims for damages and other legal action by OAM as a result of the employment of Drs. Henne, Lenters, Sandman and Healey. Plaintiffs therefore needed to bring this action in order to obtain declaratory relief to establish that the noncompetition clauses are void and unenforceable under these circumstances.

## Health Care Provider Reimbursement and Competition

82.     Hospitals and other health care providers obtain their revenues through government programs (such as Medicare and Medicaid) and through payments by commercial payors who provide insurance to their members. Virtually no hospital services are paid for by uninsured individuals.

83.     Payments by commercial payors are very important to the success of any hospital, given the lower level of payments made by Medicare and Medicaid. No hospitals or physician group could operate successfully based only on treatment of Medicare and Medicaid patients.

84.     Competition among health care providers occurs in two stages. In the first stage, providers compete to be selected as in-network providers by commercial managed care plans (also referred to herein as "commercial payors"). Employers typically select commercial managed care plans on behalf of their employees. Commercial payors seek to offer convenient networks of providers, including, most importantly, hospitals and physicians, for their members. Employees and subscribers prefer to have a choice from a variety of providers in convenient locations near where they reside. Managed care plans negotiate contracts with hospitals and physicians to create provider networks which provide these choices.

85.     Employees and subscribers pay higher out-of-pocket costs when they see a non-contracted or out-of-network provider, and in some instances may have no insurance coverage available at all if they use an out-of-network provider. Patients who are insured through a managed care plan therefore have an incentive to choose in-network providers in order to minimize or avoid out-of-pocket expenses, and providers have incentives to participate in managed care plans' networks because that increases their access to patients insured through those organizations.

86.     In the second stage of competition, health care providers compete with other in-network providers to attract patients. Managed care plans typically offer multiple in-network providers with similar out-of-pocket costs, and those providers compete primarily on non-price dimensions in this second stage to attract patients by offering better services, amenities, convenience, quality of care, and patient satisfaction than their competitors offer. Price competition occurs primarily at the first step of competition, in negotiations between payors and providers.

**Relevant Antitrust Product Markets**

87.     One relevant product market in this case is the market for inpatient orthopedic surgical services, which are provided in hospitals. Common orthopedic procedures performed in hospitals include joint replacement, spinal fusion, bone fracture repair, soft tissue repair, and arthroscopy. An inpatient stay is one that requires an overnight stay. These services are offered to patients by the same set of hospital competitors and under similar competitive conditions. All commercial health insurance products cover inpatient orthopedic surgical services.

88.     A second relevant product market in this case is the market for outpatient orthopedic surgical services provided at hospital-based facilities ("outpatient surgical services"). This includes outpatient procedures performed in hospital facilities as well as procedures

46410094.36

performed in other hospital-owned facilities. Outpatient services do not require an overnight stay. These services are offered to patients by the same set of hospital-based competitors and under similar competitive conditions. All commercial health insurance products cover outpatient orthopedic surgical services.

89.    Some outpatient procedures and services are also provided in non-hospital settings, such as ambulatory surgery centers ("ASC"), not owned by hospitals. However, there are important differences between hospital-based outpatient services and outpatient services provided in other settings.

90.    While some patients may choose non-hospital outpatient facilities for outpatient orthopedic care, non-hospital facilities are not a substitute for hospitals for outpatient orthopedic care in health plans' networks. No health plan in Kent County has excluded hospital outpatient orthopedic services from a network in favor of only non-hospital services. This is true for several reasons:

     a.    Many patients prefer to utilize their hospitals' facilities for outpatient as well as inpatient services because they know and trust the hospital brand.

     b.    Many patients who are elderly or who have other ailments need to have these services provided in a hospital setting so that more extensive backup services such as intensive care units are available if a problem should occur.

     c.    Physicians located on hospital campuses prefer to refer their patients needing outpatient services to facilities on those campuses for convenience, and often prefer to refer their patients to hospital-owned

facilities because they share common electronic medical records with the hospitals.

    d.    It is also more convenient and efficient for physicians to perform their surgeries, including their outpatient surgeries, at the same locations as their inpatient surgeries.

91.    Health plan networks need to include hospital outpatient orthopedic facilities in their networks to appeal to the significant number of patients who prefer those facilities, especially since employers seek networks which satisfy as many of their employees as possible. Therefore, the provision of these outpatient services by non-hospital entities are not a substitute for hospital outpatient services in health plans' networks.

92.    One study found that ASC entry did not have a significant impact on hospitals' outpatient surgical volume, indicating that patients do not see surgeries at ASCs as substitutes for surgeries at hospitals. Another study found that hospitals saw much larger price increases than ASCs for the same outpatient procedures between 2007 and 2012, indicating the existence of differences in the competitive conditions facing ASCs and hospitals even for the same procedures. According to another study, outpatient procedures and services delivered in hospitals are often reimbursed at a higher rate than those delivered at a non-hospital setting.

93.    Another relevant product (or service) market here is the market for the provision of professional orthopedic surgical services, i.e. orthopedic surgical services provided by physicians. Orthopedic disorders are treated by orthopedic surgeons who specialize in the musculoskeletal system of bones, joints, ligaments, tendons, and muscles.

94.    Significant injuries and diseases of the musculoskeletal system require treatment by an orthopedic surgeon. Orthopedic surgeons receive an extended education that includes

medical school, a five year residency in general and orthopedic surgery, and often a one or two year fellowship. Many orthopedic surgeons also become board certified, which entails meeting these educational requirements as well as passing a comprehensive examination on the diagnosis and treatment of orthopedic ailments. No other specialists provide comprehensive or intensive orthopedic surgery as do orthopedic surgeons, and many patients require the services of an orthopedic surgeon.

95.    For these reasons, other physicians are not substitutes for adult orthopedic surgeons for patients with significant injuries and diseases of the musculoskeletal system. Because of the significant number of such patients, payors could not offer a successful provider network without including significant numbers of orthopedic surgeons in the network. Every significant payor offering a network for employers in Kent County, includes orthopedic surgeons in its network.

96.    The product markets described above apply to services provided to commercially insured patients, because health care services provided to commercially insured patients are in a distinct market from those services when provided to other patients. Most insured consumers of health care are covered either by one of two government insurance programs (Medicare or Medicaid) or by private insurance organizations. Medicare and Medicaid are government programs which fix their fees and do not compete with commercial insurers for these services. A hospital could not increase its volume or revenue by persuading patients to sign up for Medicare or Medicaid, because enrollment in these programs is limited to the elderly, disabled and underprivileged. Medicare and Medicaid typically pay significantly lower rates than do commercial insurers and, therefore, are not an alternative to them for hospitals and physicians.

97.     Another set of product markets consists of each of the groups of services described above, but provided to Medicare Advantage subscribers, rather than to commercially insured patients. Unlike traditional commercial insurance, Medicare Advantage is only available to individuals who are eligible for Medicare, and therefore is not a substitute for commercial insurance. Medicare Advantage also represents a distinct market from traditional Medicare. Medicare Advantage offers substantial additional benefits as compared to basic Medicare. Academic studies show a distinct preference for Medicare Advantage among its subscribers as compared to traditional Medicare.

98.     Individual providers have no ability to determine the fees that Medicare and Medicaid pay them, and therefore cannot exercise market power with respect to reimbursement by government payors. However, providers negotiate the rates that private insurance companies pay, and they ordinarily charge private payors (providing commercial or Medicare Advantage coverage) substantially more than they are paid by either Medicare or Medicaid. Market power can be a factor in these negotiations.

99.     The loss of commercially insured and Medicare Advantage cases is especially impactful to Saint Mary's, because like many hospitals, it depends on commercially insured cases to provide its margin. Medicare and Medicaid cases produce little, if any, margin over cost, and therefore the loss of commercially insured cases is especially harmful to the financial health and ability to compete of a hospital such as Saint Mary's. Saint Mary's, like other hospitals, could not survive if it treated only Medicare and Medicaid patients.

### Relevant Antitrust Geographic Markets

100.    Kent County is a relevant geographic market in this case with respect to each relevant product market. Kent County includes the city of Grand Rapids and surrounding areas. Individuals living in Kent County and their employers seek local health care, including local

46410094.36

hospitals. Only about 5% of patients residing in Kent County leave that area for orthopedic care. Hospitals outside of Kent County do not actively market themselves to most patients in the County.

101.     There are no significant hospitals outside of Kent County which are unaffiliated with the Kent County hospitals and are closer to metropolitan Grand Rapids (where most Kent County residents live) than a one hour drive. Grand Rapids area residents would not be willing to utilize a health plan which included in its network only hospitals or orthopedic surgeons located more than a one hour drive away from Grand Rapids. Health plans include hospitals in their networks for all or virtually all services provided by the hospitals and do not establish separate networks for orthopedic surgery procedures. Any such distinctions would be confusing and difficult for patients and would therefore not be acceptable.

102.     Since commercial and Medicare Advantage health plans need to provide convenient networks for the majority of their patients, the fact that most patients do not want to leave the area for care means that a managed care network that wishes to be successful in attracting members and employers in Kent County needs providers in that area. A health insurer could not successfully sell health insurance products to employers with significant numbers of Kent County employees without including a choice of Kent County providers, including Kent County hospitals and orthopedic surgeons in its network.

103.     Kent County is also a highly significant area to health plans. It contains the City of Grand Rapids, which is one of the most populous cities in the state. A number of major employers are based in Kent County, including Meijer, Steelcase and Amway. As a result, health plans need to focus significant sales efforts on employers and their members in Kent County in developing their networks and product offerings.

46410094.36

104.    For these reasons, hospitals and orthopedic surgeons outside of Kent County are not reasonable substitutes for those within the county for inpatient and outpatient orthopedic surgical services at hospitals or for professional orthopedic services. All significant managed care plans offered in Kent County, including commercial and Medicare Advantage Plus, include significant numbers of Kent County hospitals and orthopedic surgeons.

### Anticompetitive Effects in Hospital Markets

105.    Enforcement of the noncompete would drastically reduce the ability of Saint Mary's to provide orthopedic surgical services. There are virtually no orthopedic surgeons in the market other than OAM and Spectrum physicians, and therefore there are no other significant alternative sources of professional orthopedic cases in the market.

106.    It is highly likely that the departure of Drs. Henne, Lenters, Healey and Sandman would cause substantial portions of their volume to shift to Corewell (previously Spectrum Health), the dominant hospital system in Kent County. When Saint Mary's lost surgery cases as a result of changes in anesthesia coverage in 2016, the majority of the business went to Spectrum's hospitals. One of Corewell's hospitals is only 1.5 miles from the Saint Mary's campus. 50% of OAM's orthopedic surgeries in Kent County performed at hospitals and not occurring at Saint Mary's are at Corewell hospitals. For these reasons, if patients were diverted from Saint Mary's as a result of enforcement of the noncompetes, at least 50% of these patients would likely be treated at Corewell.

107.    The relevant inpatient orthopedic surgical services markets in Kent County are highly concentrated, with Corewell's market shares exceeding 55%. Corewell's share of the relevant hospital-based outpatient orthopedic services markets exceeds 60%. Saint Mary's is one of only two significant competitors to Corewell, along with UM Health West. Saint Mary's has a share of the relevant inpatient markets approximating 19% and of the outpatient markets equaling

approximately 25%. Therefore, enforcement of the noncompetes would likely increase Corewell's share from approximately 55% to 60% and approximately 60 to 64%, increasing its market dominance.

108.    Under the Herfindahl-Hirschman Index ("HHI") test, a measure of market concentration set forth by the federal antitrust agencies in their Horizontal Merger Guidelines, competition is assessed by summing the squares of the market shares of the competitors. By that measure, the relevant markets are each "highly concentrated," defined by the federal antitrust agencies as markets with HHIs over 2,500. When markets are highly concentrated, even small shifts of patients from hospitals with smaller shares to hospitals with greater market shares can be anticompetitive; an increase of 200 HHI points is presumed anticompetitive. The increases here would exceed 400 points.

109.    OAM's actions threaten to foreclose Saint Mary's from access to the vast majority of the professional orthopedic surgery market, including the 64% share represented by OAM, as well as the additional share represented by Spectrum Medical Group. Additionally, even the smaller physician groups in the community are largely committed to practicing at hospitals other than Saint Mary's. OAM's actions therefore threaten to make it impossible for Saint Mary's to effectively compete in the inpatient and outpatient orthopedic surgery facilities markets.

110.    Enforcement of the noncompetes would also harm competition because it would require patients to forego the choice of Saint Mary's, despite its extremely high quality services. Given that fact, and because Saint Mary's is one of only two significant competitors of the dominant hospital in the relevant markets, diversion of cases away from Saint Mary's would depress quality competition, and further reduce overall competition.

**Anticompetitive Effects in Professional Orthopedic Surgical Services Market**

111.    As discussed above, OAM has a share of the professional orthopedic services market in Kent County of approximately 64%. This share approximately applies across the relevant product markets for professional services (commercial insurance and Medicare Advantage). If the noncompetes were not enforced, then IHA would become another competitor in that market, with a likely share of 7% or more. This would reduce OAM's share from 64% to 57%. This would reduce the market HHI by 800 points, reducing an HHI of more than 47% to under 4,000. Thus, the effect of enforcement of the noncompete would be to increases the HHI by 800 points. These levels and changes are far above demand presumptively anticompetitive under the FTC/DOJ Merger Guidelines.

112.    Enforcement of the noncompete would stymie IHA's entry into competition in the relevant professional orthopedic services markets, since, as described below, it is both extremely difficult and time-consuming to recruit new orthopedic surgeons and build up their practices. Enforcement of the noncompete would therefore prevent any increase in competition due to IHA's entry and would maintain OAM's dominant market share.

113.    The past enforcement of the noncompetition clauses against Drs. Pack, Harper, Gilde and Patthanacharoenphon has had similar effects. OAM's actions have effectively eliminated the former RVO physicians from the market, thereby significantly reducing competition.

114.    In particular, the loss of services of Drs. Henne, Lenters, Healey and Sandman would be significant for those patients and their families who have utilized these physicians on a regular basis for their orthopedic care and have come to rely upon these physicians. A substantial portion of these physicians' practice is represented by such patients. Additionally, many primary care physicians who prefer that their patients utilize the services of one or more of these four

orthopedic surgeons would be prevented from referring their patients to the surgeon of their choice.

115.    OAM has already been informing patients of Drs. Henne, Lenters, Healey and Sandman that they are leaving the practice. Many patients have reached out to these physicians asking if they would be available to treat them.

116.    The 50 mile radius restriction in the noncompete would prevent Drs. Henne, Lenters, Healey and Sandman from practicing at any location that was convenient to their patients. For example, that restriction would preclude their practicing even at locations as distant as Muskegon and Kalamazoo.

117.    If these four physicians were forced to leave the market, patient wait times would significantly increase. This would further harm competition and patient access.

118.    Enforcement of the noncompete would also interfere with Drs. Henne and Healey's work as volunteer team orthopedic physicians to Grand Valley State University. While this relationship is not formalized, it is significant; Drs. Henne and Healey provide regular and ongoing care to GVSU athletes. These athletes would suffer significantly if the noncompete were enforced.

<u>**Anticompetitive Effects of Noncompetition Clauses**</u>

119.    The Federal Trade Commission's recent Notice of Proposed Rule Making with regard to a proposed rule to prohibit many noncompetition clauses provides evidence that physician noncompetition clauses can be significantly anticompetitive:

> [T]here is evidence non-compete clauses increase consumer prices and concentration in the health care sector.

> \*          \*          \*

> [N]on-compete clauses foreclose the ability of competitors to access talent by effectively forcing future employers to buy out

workers from their non-compete clauses if they want to hire them. Firms must either make inefficiently high payments to buy workers out of non-compete clauses with a former employer, which leads to deadweight economic loss, or forego the payment—and, consequently, the access to the talent the firm seeks. Whatever choice a firm makes, its economic outcomes in the market are harmed, relative to a scenario in which no workers are bound by non-compete clauses.

## **Significance of Changes in Concentration**

120.    Economic research overwhelmingly shows that greater market concentration (higher shares) substantially increases prices in health care:

a.      A 2011 study examined the effect of hospital market concentration on specific procedures. It found that in concentrated hospital markets, hospitals charged 29% more for cervical fusion, 31% more for lumbar fusion, 45% more for total knee replacement, 49% more for total hip replacement, 50% more for angioplasty, and 56% more for CRM device insertion. James C. Robinson, *Hospital Market Concentration, Pricing, Profitability in Orthopedic Surgery and Interventional Cardiology,* 117(6) THE AM. J. OF MANAGED CARE e241, e244 (2011).

b.      One study from 2009 looked at the effect of hospital mergers and consolidations (and the resulting increase in market concentration) on the prices charged by nearby "rival" non-merging hospitals across the United States from 1989 to 1996. It found that non-merging hospitals increased prices 40 percent in response to hospital mergers. Leemore Dafny, *Estimation and Identification of Merger Effects: An Application to Hospital Mergers,* 52 J. L. & Econ. 523, 544 (2009).

c.   A 2011 study examined the effect of concentrated hospital markets on hospital prices in 2001 and 2004. It concluded that "hospital prices are higher in more concentrated markets" and that a "1,000-percentage-point increase in the Shreveport hospital concentration index raises prices by approximately 8.3 percent." Glenn A. Melnic, Yu-Chu Shen and Vivian Yaling Wu, *The Increased Concentration of Health Plan Markets Can Benefit Consumers through Lower Hospital Prices,* 30(9) Health Affairs 1728, 1729-31 (2011).

d.   Another study found that "[i]ncreases in hospital market concentration lead to increases in the price of hospital care." Martin Gaynor and Robert Town, *The Impact of Hospital Consolidation—Update,* Robert Wood Johnson Foundation, THE SYNTHESIS PROJECT (June 2012) at 1.

e.   A 2018 study found prices at monopoly hospitals are 12 percent higher than prices in markets with four or more competitors. Zack Cooper, Stuart V. Craig, Martin Gaynor and John Van Reenen, *The Price Ain't Right? Hospital Prices and Health Spending on the Privately Insured*, The Quarterly Journal of Economics, vol. 134(1), pages 51-107 (Feb. 2019).

121.   Price increases resulting from higher concentration are passed on to local employers and their employees. Self-insured employers pay the full cost of their employees' health care claims and, as a result, they immediately and directly bear the full burden of higher rates. Fully-insured employers are also inevitably harmed by higher rates, because health plans are forced to pass on at least a portion of hospital rate increases to these customers.

122.     Employers, in turn, pass on their increased health care costs to their employees, in whole or in part. Employees bear these costs in the form of higher premiums, higher co-pays, reduced coverage, and/or restricted services.

123.     Economic research also reveals that high concentration, and less competition, can result in lesser quality health care. One study found that "the evidence suggests that increasing hospital concentration lowers quality." William B. Vogt and Robert Town, *How has hospital consolidation affected the price and quality of hospital care?*, Robert Wood Johnson Foundation, THE SYNTHESIS PROJECT 4, 8-9 (Feb. 2006). The 2012 update to the Synthesis Project stated that all of the U.S. studies except for one found that competition improves quality." Martin Gaynor and Robert, *The Impact of Hospital Consolidation-Update*, Robert Wood Johnson Foundation. THE SYNTHESIS PROJECT 4 (June 2012). Other recent studies confirm that greater concentration is associated with lesser quality. Koch TG, Wendling BW, Wilson NE, *Physician Market Structure, Patient Outcomes, and Spending: An Examination of Medicare Beneficiaries*, Health Services Research 2018; 53(5):3549-3568.

124.     Other studies have specifically addressed increased concentration in physician markets:

> a.     A peer-reviewed study by economists from the Federal Trade Commission found that concentration in markets for physician services reduces the quality of care. Koch TG, Wendling BW, Wilson NE, *Physician Market Structure, Patient Outcomes and Spending: An Examination of Medicare Beneficiaries*, Health Services Research 2018; 53(5):3549-3568. In particular, this research found that increases in concentration in markets for cardiologist services is associated with statistically and economically

significant increases in heart attack rates, emergency visits, hospital readmissions, and mortality among Medicare beneficiaries.

b.  Research from an economist at the Congressional Budget Office found that increases in concentration in markets for physician services are associated with increased rates of exit of Medicare Advantage plans. Pelech D, *Dropped out or pushed out? Insurance market exit and provider market power in Medicare Advantage*, Journal of Health Economics 2017; 51:98-112.

125.  As a result, increases in concentration resulting from enforcement of the noncompetes will likely lead to higher prices and poorer quality care because of the resulting increases in concentration.

## Barriers to Entry

126.  Neither hospital entry nor expansion by any hospital will deter or counteract the anticompetitive effects described herein, for multiple reasons. Construction of a new general acute-care hospital would take substantially more than two years from the initial planning stages to opening doors to patients. Entry and expansion are also unlikely due to very high construction costs, operating costs, and financial risk. Constructing a new hospital requires an extraordinarily large, up-front capital investment, and the pay-off is risky and deferred into the future, which makes it highly unlikely that a new hospital competitor would enter the Kent County hospital market.

127.  Construction and operation of an independent competitive hospital would be especially difficult, given the large number of physicians controlled by Corewell, since these physicians are unlikely to admit patients at a competitive hospital.

128.    A state-granted Certificate of Need is required to build a new hospital or engage in significant facility expansion of a hospital in Michigan. It is virtually impossible to obtain a Certificate of Need for a new hospital in Michigan, given the philosophy of state regulators that there are too many hospitals in the state and that the addition of new hospitals will only add health care costs.

129.    There are also significant barriers to entry into competition for outpatient ambulatory surgery centers. A Certificate of Need is required for the opening of such a center. Regulatory authorities generally do not permit such centers to open unless there is demonstrated need.

130.    There are also significant barriers to entry into professional orthopedic surgery services, for several reasons. First, there is a nationwide shortage of orthopedic surgeons. Patrick Boyle, *U.S. physician shortage growing*, Association of American Medical Colleges (June 26, 2020). By 2025, a shortage of 500 orthopedic surgeons is projected nationwide, Phillip Miller, *A Shortage of Orthopedic Surgeons is Looming*, Merritt Hawkins, (Nov. 12, 2019). The Association of American Medical Colleges further projects that by 2025 the U.S. will have a shortage of up to 23,400 surgical specialists, with one of the four "greatest shortages in . . .orthopedic surgery." Julia Haskins, *Desperately seeking surgeons*, Association of American Medical Colleges, (April 26, 2019).

131.    Second, recruitment of physicians is a slow process, requiring at least 12 to 18 months to successfully recruit an additional physician even where recruitment is possible. Third, it takes several years for any recruited physician to build up a significant practice so that the physician can operate on a successful basis. It has been estimated that over the first three years of

37

employing a physician, their employees lose approximately $150,000 to $250,000 per physician per year. This loss is explained, in part, by slow ramp-up.

132.    Third, many patients who have established relationships with physicians are unlikely to switch their patronage to new physicians or new hospitals, unless they are given a strong reason to do so. Patient loyalty makes it difficult for new entrants to ramp up their practices.

133.    Fourth, small independent physician practices do not have the resources to recruit additional physicians to their practices.

134.    Fifth, almost 60% (almost 10,000) of orthopedic surgeons nationwide are 55 years old or older, indicating that there will be a substantial number of retirements of orthopedic surgeons in the very near future. But only 700 new orthopedic surgeons come out of residency training each year. Therefore, the current shortage of orthopedic surgeons is expected to grow and recruitment of new orthopedic surgeons to any given location or practice is extremely difficult. At the same time, demand for orthopedic surgery services is increasing substantially as the population ages.

135.    For these reasons, successful entry or expansion of services in any of the relevant markets is extremely unlikely.

### OAM's Noncompete Agreements Do Not Provide Any Procompetitive Benefits and Do Not Serve a Reasonable Business Interest

136.    OAM's noncompete agreements do not serve any reasonable business interest. They do not serve to protect any confidential information, since none of the information possessed by Drs. Henne, Lenters, Healey or Sandman is at all confidential.

137.    Nor does OAM possess any unique customer relationships or goodwill. Drs. Henne, Lenters, Healey and Sandman established their practices long before they went to work

for OAM. The four physicians have not taken any patient lists with them. In any event, lists of their patients are not confidential. Any patients who have had, or are scheduled for, orthopedic surgery will already have been identified in the systems of THM.

138.    The noncompetes are also unreasonable because they interfere with patient choice, and prevent patients of Drs. Henne, Lenters, Healey and Sandman from utilizing their preferred orthopedic surgeon or from obtaining continuing care from the surgeon who has treated them. The restriction on practice within 50 miles of their current locations means that Drs. Henne, Lenters, Healey and Sandman cannot practice at a location that would be convenient or even feasible for most of their current patients.

139.    Harm to OAM from the loss of Drs. Henne, Lenters, Healey and Sandman would be far less than the harm that THM would suffer if it is not able to employ these physicians. That is because revenues involved in hospital treatment of patients receiving orthopedic surgery (including equipment, nursing staff and other expenses) far exceeds the revenues that these physicians would generate on a professional basis and would be earned by OAM. Those revenues are not likely to exceed a few million dollars per year, while THM stands to lose at least $20,000,000 per year in revenues if these physicians are unavailable to treat THM's patients. Of course, any harm to OAM from *unfair* competition would be far smaller.

### COUNT I
### UNLAWFUL AGREEMENT IN VIOLATION OF
### SHERMAN ACT § 1

140.    Plaintiffs repeat and reallege the allegations of Paragraphs 1 through 139 above, as if fully restated herein.

141.    Each of the noncompete agreements between OAM and Drs. Henne, Lenters, Healey and Sandman is a contract, combination, and conspiracy within the meaning of the Section 1 of the Sherman Act, 15 U.S.C. § 1.

142.     OAM possesses significant market power in the relevant professional orthopedic surgeon services markets. This is demonstrated by its high market share, the high barriers to entry into these markets, and OAM's ability to exclude competition for hospital orthopedic services by Saint Mary's, because of the extremely limited professional services options available to Saint Mary's other than OAM.

143.     The noncompete clauses if enforced would have substantial and unreasonable anticompetitive effects in each of the relevant markets (including professional orthopedic surgery services and inpatient and outpatient hospital orthopedic surgery services) as set forth above.

144.     The noncompete agreements therefore threaten to unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

145.     As a direct and proximate result of Defendants' threatened violations of Section 1 of the Sherman Act and the anticompetitive effects thereof, each Plaintiff would suffer substantial harm to its business and property.

146.     These violations, and the anticompetitive effects and irreparable harm caused thereby, would continue unless enjoined.

147.     OAM would be liable for all damages resulting from lost hospital patients by Saint Mary's and lost professional orthopedic surgery cases by IHA if the noncompetes were enforced.

**COUNT II**
**VIOLATIONS OF SECTION 2 OF THE SHERMAN ACT --**
**MONOPOLIZATION**

148.     Plaintiffs restate and reallege the allegations of paragraphs 1 through 139, as if fully restated herein.

149.     OAM possesses and has possessed monopoly power in the relevant potential orthopedic surgery services markets. This is demonstrated by its high market share, the high

46410094.36

barriers to entry into these markets, and OAM's ability to exclude competition for hospital orthopedic services by Saint Mary's, because of the very limited options available to Saint Mary's other than OAM.

150.    OAM's actions described above (enforcing its noncompetes with orthopedic surgeons) and its actions taken to deter Saint Mary's and IHA from entering the professional orthopedic surgery services market (by reducing orthopedic surgeries performed at Saint Mary's, terminating its on-call agreement with Saint Mary's and refusing to staff orthopedic surgery residency programs) are being undertaken in order to maintain and enhance OAM's monopoly power. If not enjoined, these actions threaten to achieve that result. These actions are exclusionary, and constitute unlawful monopolization of each of the relevant professional orthopedic surgery markets in violation of Section 2 of the Sherman Act. 15 U.S.C. § 2.

151.    The actions of OAM have substantially harmed competition, and, if not enjoined, threaten to further harm competition in those markets.

152.    As a direct and proximate result of OAM's violations of Section 2 of the Sherman Act, IHA and THM have suffered injury to their business and property, and further injury is threatened if OAM's actions are not enjoined.

153.    OAM is liable for all damages resulting from its monopolistic conduct.

## COUNT III
## VIOLATIONS OF SECTION 7 OF THE CLAYTON ACT

154.    Plaintiffs restate and reallege the allegations of Paragraphs 1 through 139 above, as if fully stated herein.

155.    OAM's acquisition of RVO substantially lessened competition in the professional orthopedic services markets, by eliminating competition from the nine RVO orthopedic surgeons, and eliminating one of only two significant competitors to OAM in the relevant market. This

41

acquisition increased OAM's market share in the relevant professional orthopedic surgery services markets from approximately 40% to more than 60%, increasing the HHI in those markets by more than 1,500 points to more than 4,000. The transaction thus increased share by an amount far above what is presumed to be anticompetitive under the FTC/DOJ Merger Guidelines.

156.    As a direct result of the market power gained by this acquisition and the reduced competition to OAM as a result of this acquisition, OAM was able to, and had the incentive to, terminate the on-call agreement with Saint Mary's, end its support for the orthopedic residency program and reduce its performance of spine surgery cases at Saint Mary's. If the RVO transaction had not occurred, RVO would have continued the existing, fair arrangements. OAM's monopolistic position meant that there are very few alternatives that are available to Saint Mary's, making OAM's threats especially effective.

157.    As a direct result of the enhanced market power it gained from the RVO acquisition, OAM's enforcement of its noncompetes substantially harmed competition in the relevant markets. If RVO had continued to exist as a significant competitor to OAM, the enforcement of the noncompetes would not have had the market impact described above.

158.    For these reasons, as a direct and proximate result of this acquisition, Saint Mary's has suffered injury to its business and property.

**COUNT IV**
**VIOLATION OF STATE ANTITRUST LAWS**

159.    Plaintiffs repeat and reallege the allegations of Paragraphs 1 through 158 above, as if fully restated herein.

160.    Defendants' noncompete clauses violate MCL 445.772 and MCLA 445.773.

## COUNT V
## DECLARATORY JUDGMENT WITH RESPECT
## TO NONCOMPETES

161.    Plaintiffs repeat and reallege the allegations of Paragraphs 1 through 139 above, as if fully restated herein.

162.    In order to prove that a noncompete covenant is enforceable under Michigan law, the proponent of the noncompete must show: (i) the clause is necessary to prevent unfair competition; (ii) the clause is otherwise reasonable; (iii) the clause protects the proponent's confidential information or goodwill; and (iv) the clause is tailored to the situation. Additionally, the proponent must show that the noncompete does not harm competition.

163.    None of these requirements is met with regard to Defendants' noncompetes as applied to Drs. Henne, Lenters, Healey and Sandman. The noncompetes thus fail to protect any reasonable competitive business interests. The noncompetes also harm competition and violate the antitrust laws. The noncompetition provisions are therefore unreasonable and unenforceable under MCLA 445.774a.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Honorable Court:

a.    Require that Defendants release Drs. Henne, Lenters, Sandman and Healey from any restrictions on their employment by IHA;

b.    Issue a declaratory judgment finding that OAM's noncompetition clauses in their agreements with Drs. Henne, Lenters, Healey and Sandman are unenforceable and violate federal and Michigan antitrust laws;

c.    Issue a declaratory judgment that OAM's noncompetition clauses in their agreements with Drs. Henne, Lenters, Sandman and Healey are unenforceable and violate MCLA 445.774a;

43

46410094.36

d.      Grant THM and IHA three times their damages suffered as a result of the

anticompetitive actions by OAM, both now and in the future;

e.      Issue an order permanently enjoining OAM's anticompetitive behavior

described above;

f.      Award Plaintiffs their taxable costs and reasonable attorneys' fees; and

g.      Grant such other relief as this Court finds just.

### **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable.

46410094.36

s/David A. Ettinger
David A. Ettinger (P26537)
Honigman LLP
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226
(313) 465-7368 (p)
(313) 465-7369 (f)
dettinger@honigman.com

Mark S. Pendery (P57683)
Honigman LLP
300 Ottawa Ave. NW #400
Grand Rapids, MI 49503
(616) 649-1910 (p)
(616) 649-1911 (f)
Dated: January 31, 2023     mpendrey@honigman.com
*Attorneys for THM and IHA*

s/Rock A. Wood
Rock A. Wood (P41181)
Dickinson Wright PLLC
200 Ottawa Ave., N.W.
Suite 1000
Grand Rapids, MI 49503
(616) 336-1055 (p)
Dated: January 31, 2023     rwood@dickinsonwright.com
*Attorneys for Drs. Henne, Lenters, Healey and Sandman*

46410094.36

45