# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN

TRINITY HEALTH-MICHIGAN, IHA
HEALTH SERVICES CORPORATION d/b/a
TRINITY HEALTH IHA MEDICAL GROUP,
TIMOTHY HENNE, M.D., TIMOTHY
LENTERS, M.D., JOHN (JACK) HEALEY,
M.D., and GEOFFREY SANDMAN, M.D.,

        Plaintiffs,

        v.

ORTHOPAEDIC ASSOCIATES OF GRAND
RAPIDS, P.C. d/b/a ORTHOPAEDIC
ASSOCIATES OF MICHIGAN,

        Defendant.

Case No. 23-cv-00118

Honorable Hala Y. Jarbou
Hon. Phillip J. Green

Oral Argument Requested

**DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

# TABLE OF CONTENTS

FACTUAL BACKGROUND ................................................................................. 7

STANDARD OF LAW ....................................................................................... 10

ARGUMENT .................................................................................................... 10

I.     Plaintiffs Lack Article III Standing to Bring Their Claims. ............................ 10

II.    Plaintiffs' Allegations Confirm That Plaintiffs Cannot Establish Antitrust
Standing. ..................................................................................................... 13

      A.     Plaintiffs Cannot Establish Antitrust Injury .......................................... 14

      B.     Plaintiffs Cannot Establish the Remaining Requirements of Antitrust
Standing Because They Are Not Efficient Enforcers of the Antitrust Laws. ....... 16

III.    Plaintiffs Failed to Plead a Plausible Relevant Antitrust Market. .................... 18

      A.     Plaintiffs Failed to Plead a Plausible Geographic Market. ................... 19

      B.     Plaintiffs Failed to Plead a Plausible Product Market. ......................... 22

IV.    Trinity Plaintiffs Failed to Plead Monopoly Power or Barriers to Entry Necessary
to State a Section Two Claim ......................................................................... 25

      A.     Trinity Plaintiffs Have Not Alleged OAM Has Monopoly Power. ...... 26

      B.     Trinity Plaintiffs Failed to Plead that OAM Engaged in Monopolistic
Conduct. ............................................................................................... 27

V.     Plaintiffs Failed to Plead a Section One Claim ............................................... 30

      A.     Plaintiffs Do Not Plead a Section One Agreement. .............................. 30

      B.     Plaintiffs Do Not Plead Anticompetitive Effects in a Relevant Market. ............. 31

VI.    Trinity Health Michigan's Clayton Act Section 7 Claim is Time Barred. ....... 33

VII.   Plaintiffs' State Antitrust Claims Similarly Fail. ............................................ 34

VIII.  Plaintiffs' Declaratory Judgment Claim Should be Dismissed ........................ 34

CONCLUSION ................................................................................................. 34

# TABLE OF AUTHORITIES

**Cases**

**Page(s)**

*Apani Sw., Inc. v. Coca-Cola Enters., Inc.*,
   300 F.3d 620 (5th Cir. 2002) ...................................................................22, 24, 25

*Ashcroft v. Iqbal*,
   556 U.S. 622 (2009) ..........................................................................................10

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
   427 U.S. 585 (1985) ....................................................................................28, 30

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
   459 U.S. 519 (1983) ....................................................................................17, 18

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ....................................................................................10, 13

*Betancourt v. Indian Hills Plaza LLC*,
   2023 WL 2388553 (E.D. Mich. Mar. 7, 2023) ....................................................20

*Borg-Warner Protective Servs. Cop. v. Guardsmark, Inc.*,
   946 F. Supp. 495 (E.D. Ky. 1996), aff'd, 156 F.3d 1228 (6th Cir. 1998) .............31

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962) ..........................................................................................18

*Byars v. Bluff City News Co., Inc.*,
   609 F.2d 843 (6th Cir. 1979) .............................................................................26

*In re Cardizem CD Antitrust Litig.*,
   332 F.3d 896 (6th Cir. 2003) ..................................................................14, 15, 16

*Caremark Homecare, Inc. v. New England Critical Care, Inc.*,
   700 F. Supp. 1033 (D. Minn. 1988) ...................................................................31

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
   479 U.S. 104 ......................................................................................................17

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*,
   511 F.3d 535 (6th Cir. 2007) ..................................................................32, 33, 34

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
   399 F.3d 651 (6th Cir. 2005) .........................................................................5, 20

*Claudill v. Lancaster Bingo Co.*,
  2005 WL 2738930 (S.D. Ohio Oct. 24, 2005) ......................................................33

*Copperweld Corp. v. Independent Tube Corp.*,
  467 U.S. 752 (1984) ....................................................................................30, 31

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006) ..............................................................................................11

*Defiance Hosp. v. Fauster-Cameron, Inc.*,
  344 F. Supp. 2d 1097 (N.D. Ohio 2004) .............................................................13

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992) ..............................................................................................26

*Eichorn v. AT&T Corp.*,
  248 F.3d 131 (3d Cir. 2001) ................................................................................32

*Found for Interior Design Educ. Rsch. v. Savannah Coll. of Art & Design*,
  73 F. Supp. 2d 829 (W.D. Mich. 1999), aff'd, 244 F.3d 521 (6th Cir. 2001) ........35

*Gatt Commc'ns, Inc. v. PMC Assoc., L.L.C.*,
  711 F.3d 68 (2d Cir. 2013) ..................................................................................16

*Geomatrix, LLC v. NSF Int'l*,
  2022 WL 4369950 (E.D. Mich. Sept. 21, 2022) .............................................5, 12

*GTE Data Servs., Inc. v. Elec. Data Sys. Corp.*,
  717 F. Supp. 1487 (M.D. Fla. 1989) ....................................................................31

*Guzowski v. Hartman*,
  969 F.2d 211 (6th Cir. 1992) .........................................................................30, 31

*Hanger v. Berkley Grp., Inc.*,
  2015 WL 3439255 (W.D. Va. May 28, 2015) ......................................................25

*Hillard v. First Fin. Ins.*,
  968 F.2d 1214 (6th Cir. 1992) ....................................................................5, 12, 28

*Hodges v. WSM, Inc.*,
  26 F.3d 36 (6th Cir. 1994) ..............................................................................15, 16

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ..............................................................................................11

*Marshall v. Miles Laboratories*,
  647 F. Supp. 1326 (N.D. Ind. 1986) ....................................................................31

i

*Matsuchita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)..................................................................................19

*Michigan Div.-Monument Builders of N. Am. v. Michigan Cemetery Ass'n*,
524 F.3d 726 (6th Cir. 2008) ............................................................ *passim*

*Morgan v. Church's Fried Chicken*,
829 F.2d 10 (6th Cir. 1987) .......................................................................10

*Murray v. Chrysler Grp., LLC*,
2013 WL 5340782 (E.D. Mich. Sept. 23, 2013)......................................31

*Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*,
419 F.3d 462 (6th Cir. 2005) ....................................................................23

*NicSand, Inc. v. 3M Co.*,
507 F.3d 442 (6th Cir. 2007) .....................................................13, 14, 17

*Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*,
555 U.S. 438 (2009)..................................................................................28

*Park Ave. Radiology Assocs., P.C. v. Methodist Health Sys., Inc.*,
198 F.3d 246 (6th Cir. 1999) ...............................................................17, 18

*Parker v. Parker*,
2023 WL 2572382 (N.D. Ill. Mar. 20, 2023).........................................12

*Pretasky v. MarineMax, Inc.*,
2002 WL 32345612 (W.D. Wis. Mar. 7, 2002).................................11, 12

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
124 F.3d 430 (3d Cir. 1997).....................................................................25

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)..................................................................................11

*St. Luke's Hosp. v. ProMedica Health Sys., Inc.*,
8 F.4th 479 (6th Cir. 2021) ...........................................................28, 29, 30

*Texas v. U.S.*,
523 U.S. 296 (1998)..................................................................................11

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001)......................................................................23

*Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
552 F.3d 430 (6th Cir. 2008) ...........................................................18, 23, 25

*True Freight Logistics LLC v. Glob. Tranz Enterprises, Inc.*,
  2019 WL 11840292 (D. Ariz. Jan. 11, 2019) .......................................................................13

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) ...........................................................................................26, 27

*Valley Prod. Co. v. Landmark*,
  128 F.3d 398 (6th Cir. 1997) ........................................................................................5, 14, 15

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004).....................................................................................................26, 27, 28

*Warrior Sports, Inc. v. Nat'l Collegiate Athletic Ass'n*,
  623 F.3d 281 (6th Cir. 2010) ............................................................................................31, 32

*Wright v. County of Mescota*,
  2018 WL 4923906 (W.D. Mich. Oct. 10, 2018)...................................................................34

*Z Technologies Corp. v. Lubrizol Corp.*,
  753 F.3d 594 (6th Cir. 2014) ................................................................................................34

**Statutes**

15 U.S.C. § 1 ................................................................................................................... *passim*

15 U.S.C. § 2 ................................................................................................................... *passim*

15 U.S.C. § 18 .........................................................................................................................33

MCLA 445.774a .................................................................................................................33, 34

MCLA 445.781 .......................................................................................................................34

**Rules**

Fed. R. Civ. P. 12(b)(1)...........................................................................................................35

Fed R. Civ P. 12(b)(6)..............................................................................................................35

**Regulations**

16 CFR § 910.3 .......................................................................................................................32

This case is about the falling out of a contractual relationship between Defendant Orthopaedic Associates of Michigan ("OAM") and Saint Mary's Hospital, and the subsequent money grab by Saint Mary's and certain of OAM's former orthopedic surgeon employees.

OAM and Saint Mary's[1] had an on-call services contract, whereby orthopedic surgeons employed by OAM would perform inpatient surgeries at Saint Mary's, and both parties would share in the revenue. This was a legacy relationship that OAM inherited when it acquired another orthopedic practice, River Valley Orthopedics ("RVO"), in 2018. OAM purchased RVO and along with it, its roster of orthopaedic surgeon employees. Four of those RVO-turned-OAM physicians are the individual physician plaintiffs here (collectively "Physician Plaintiffs").[2] When the RVO transaction occurred, Physician Plaintiffs became shareholders and directors of OAM. After the RVO transaction, the Physician Plaintiffs continued to service the on-call contract with Saint Mary's.

As the Complaint explains, the inherited relationship between OAM and Saint Mary's was fraught from the start. Despite "numerous meetings to try to establish cooperative relationships," the parties were "unable to do so." (Compl., ECF No. 1, ¶ 31.) The relationship continued to sour over time. After the Physician Plaintiffs that serviced the on-call contract announced they would be resigning from OAM, OAM informed Saint Mary's that it wished to terminate the parties' on-call services contract, effective the date of the Physician Plaintiffs' departure. OAM's routine and unilateral business decision to terminate a services contract that no longer served it is one of two so-called antitrust violations that form the basis of this lawsuit.

---

[1]   Saint Mary's is owned by Plaintiff Trinity Health Michigan. Plaintiff Trinity Health IHA (together with Trinity Health Michigan, the "Trinity Plaintiffs") is the arm of Trinity Health that employs physicians.

[2]   Physician Plaintiffs are Drs. Timothy Henne, Timothy Lenters, John (Jack) Healey, and Geoffrey Sandman.

The other is OAM's routine business decision to include a standard non-competition provision in its RVO physician contracts in connection with OAM's purchase of RVO. As the Complaint details, that provision precludes a departing OAM physician from providing orthopaedic professional services within 50 miles of an OAM office, for 12 months after resignation. As courts across the country have recognized, this is a routine and standard practice in the purchase or acquisition of a business. Indeed, such transactions would not happen without such a protection. It is easy to imagine how the value of an acquired physician practice could swiftly plummet to zero if the physicians that sold their practice then turned around and left, bringing their patients with them, to start a competing business across town. As this scenario makes clear, the four Physician Plaintiffs **benefited substantially** from the very provision they now challenge. First, when they sold their practice to OAM for a price that accounted for the fact that this bait-and-switch maneuver was precluded by the parties' contracts. And second, when—as the Complaint details—other former RVO physicians departed OAM and the Physician Plaintiffs stayed on, sharing in the revenue that would have been lost if those departing physicians were contractually permitted to take OAM patients and know-how and start another practice across town.

But then the Physician Plaintiffs decided to resign from OAM, and did not want the same contract provision to apply to them upon departure. Instead, they devised a plan with Saint Mary's—while they were still directors and shareholders of OAM and still under their OAM employment agreements—whereby Saint Mary's would hire the Physician Plaintiffs directly and cut OAM from the shared on-call revenue arrangement between OAM and Saint Mary's. The only thing standing in the way of this money grab was, of course, the non-compete provision in the Physician Plaintiffs' employment contracts. As the Complaint details, OAM made clear its

willingness to engage in good faith negotiations regarding potential "buy out" of these contracts, as is standard practice. But Saint Mary's had no interest in paying, so instead it entered employment contracts with the Physician Plaintiffs in contravention of those physician's OAM contracts. Tellingly, Plaintiffs pursued this path despite *full knowledge* that Physician Plaintiffs could not work for Saint Mary's under their employment contracts with OAM. Thus if anyone's conduct caused delays and confusion to patients as the Complaint contends, it is *Plaintiffs* who are responsible for that harm.

*One day after* OAM rejected a pretextual "buy-out" offer far below market value, Plaintiffs brought their 44-page Complaint, seeking treble antitrust damages for this routine business dispute to intimidate OAM out of enforcing its non-compete provision. Plaintiffs allege five causes of action under federal antitrust laws and related state laws: (1) All Plaintiffs claim that the non-compete provision is an illegal agreement between OAM and the Physician Plaintiffs under Sherman Act §1 (Count I); (2) the Trinity Plaintiffs bring a Sherman Act §2 claim, contending that OAM is a monopolist and that termination of the on-call contract and OAM's refusal to waive the non-compete provision was monopolistic conduct (Count II); (3) Trinity Health Michigan brings a Clayton Act §7 claim contending that OAM's 2018 acquisition of RVO was an antitrust violation in itself (Count III); (4) all Plaintiffs bring a claim under Michigan's state antitrust statute alleging the same conduct as the federal antitrust claims (Count IV); and (5) all Plaintiffs request a declaratory judgment that OAM's non-compete provision is unreasonable under Michigan law that governs these provisions (Count V).

Plaintiffs' strategy fails because Plaintiffs cannot state a claim under the antitrust laws. But the Court need not even reach Plaintiffs' pleading deficiencies under the antitrust laws because their Complaint suffers from an even more fundamental problem. Plaintiffs cannot establish injury-

in-fact or ripeness sufficient to satisfy Article III standing because they cannot claim to have suffered any injury. Plaintiffs' purported injury for both their non-compete claims and their on-call contract claims is the Physician Plaintiffs' inability to work for Trinity Plaintiffs. To be sure, Physician Plaintiffs breached their contract with OAM and are accountable for the consequences. But Plaintiffs do not allege any conduct taken by OAM to date to enforce its non-competition provision or to prevent Physician Plaintiffs from going to work for Trinity Plaintiffs. Indeed, since the Complaint has been filed, Physician Plaintiffs have in fact ***begun work for the Trinity Plaintiffs.*** Those entities are advertising the new doctors at their office locations as well as on their website:



(Mutchnik Declaration, Ex. 1-2.)[3] Because Plaintiffs cannot establish any injury arising from OAM's conduct, they lack standing to bring their claims.

Moreover, even if the Court were to reach the merits of Plaintiffs' antitrust claims, the Complaint is rife with fundamental, threshold flaws that cannot be cured by re-pleading.

***First***, Plaintiffs have not established antitrust standing, the threshold, pleading-stage doctrine used to prevent plaintiffs from disguising routine business disputes as antitrust lawsuits. The first prong, antitrust injury, asks whether plaintiffs' alleged injury flows from the anticompetitive aspect of the alleged antitrust violation. The Sixth Circuit is particularly "aggressive in using the antitrust injury doctrine to bar recovery," in particular where plaintiff would suffer the same injury absent any alleged antitrust violation at all. *Valley Prod. Co. v. Landmark*, 128 F.3d 398, 403, 406 (6th Cir. 1997). That is exactly the case here, where Plaintiffs' alleged injury of reduced profits or patient volume stem not from any antitrust violation, but from OAM's lawful actions under its contracts.

***Second***, Plaintiffs fail to allege a plausible relevant antitrust market, a gating requirement for each of its antitrust claims. An antitrust plaintiff must allege dimensions of both a geographic market and a product market, and the alleged market must "correspond to the commercial realities and be economically significant." *Michigan Div.-Monument Builders of N. Am. v. Michigan Cemetery Ass'n*, 524 F.3d 726, 733 (6th Cir. 2008). Both dimensions of Plaintiffs' alleged markets fail this test. Plaintiffs' geographic market is limited only to Kent County, but the face of the Complaint shows such a narrow market is implausible. Plaintiffs' product market improperly

---

[3]   In a factual attack to subject matter jurisdiction, the court may consider and evaluate evidence outside the pleadings. *See, e.g., Geomatrix, LLC v. NSF Int'l*, 2022 WL 4369950, at *3 (E.D. Mich. Sept. 21, 2022). In addition, on a motion to dismiss, a court may take judicial notice of a website. *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 655 n.1 (6th Cir. 2005).

excludes competitors identified in Plaintiffs' own allegations in order to gerrymander a narrow market within which Plaintiffs can allege OAM has market power. These tactics warrant dismissal.

**Third**, Trinity Plaintiffs' Sherman Act §2 monopoly claim fails as a matter of law. Plaintiffs have not even tried to allege monopoly power. The Sixth Circuit instructs that 75-80% market share should be the starting point for finding monopoly power. Even accepting Plaintiffs' contrived antitrust market as true, they only allege that OAM has 64% market share. Trinity Plaintiffs' §2 claim can be easily dismissed on this basis alone. But Trinity Plaintiffs also fail to allege the additional element of monopolistic conduct. Trinity Plaintiffs cannot allege that OAM's contractual decisions were monopolistic because Supreme Court and Sixth Circuit precedent are clear that a business entity is free to choose the parties with whom it will deal, or not deal.  Trinity Plaintiffs try to tailor their form allegations to fit into the narrow exception to that rule, but their unsupported suggestions that OAM's conduct was against its self interest are contradicted by the plethora of legitimate business reasons apparent on the face of the Complaint.

**Fourth**, Plaintiffs' Sherman Act §1 conspiracy claim also fails. The quintessential element of a §1 claim is an agreement to restrain competition between two or more separate parties. The only purportedly illegal agreement that Plaintiffs allege is the employment contract between OAM and Physician Plaintiffs that contains the non-compete provision. But Sixth Circuit and Supreme Court precedent dictate that a company and its employees cannot conspire for purposes of §1. Plaintiffs' §1 claim can be easily dismissed on that basis alone. Moreover, Plaintiffs do not allege anticompetitive effects stemming from the alleged illegal agreement; they are only focused on their own alleged lost profits, which is not enough. And Plaintiffs face an especially steep hill on this issue because the Sixth Circuit has explicitly held that non-compete clauses like the one here are not anticompetitive, particularly in the context of the purchase of a business.

**Fifth**, Trinity Michigan's Clayton Act §7 claim is time barred because the Complaint confirms that the four-year statute of limitations, which runs from the date of the close of the acquisition, has passed. The claim can be swiftly dismissed on this basis.

**Finally**, Plaintiffs' state antitrust claims fail on the same grounds as their federal claims, and in any event the Court should decline to exercise pendent jurisdiction over Plaintiffs' state claims. Moreover, the exact parameters of OAM's non-compete provision have been explicitly recognized by the Sixth Circuit as lawful. Plaintiffs' declaratory judgment claim fails on this basis too.

The Court should see this lawsuit as the routine business dispute that it is and reject Plaintiffs' attempt to wield the antitrust laws as a treble-damages sword in order to intimidate OAM away from enforcing its contractual rights. And because Plaintiffs' claims are marred by fundamental flaws that cannot be cured with amendment, dismissal should be with prejudice.

## FACTUAL BACKGROUND[4]

Defendant OAM is an orthopaedic practice with offices in Kent County, Michigan, as well as the neighboring county of Montcalm. (Compl. ¶ 18.) OAM sees patients from across west Michigan. (*Id.* ¶ 17.) In 2018, OAM acquired RVO, another orthopedic practice. (*Id.* ¶ 29.) In conjunction with the purchase of that business, OAM entered into employment agreements with the RVO physicians, including Doctors Henne, Lenters, Healey, and Sandman, who are the Plaintiff Physicians here. (*Id.*) As is standard in such purchases, the employment agreements between OAM and the RVO physicians contain a noncompetition provision, which provides, that for a period of 12 months following resignation, and within 50 miles of an OAM office, the employee will not render services of the type performed for OAM. (*Id.* ¶ 52.)

---

[4]    Plaintiffs' allegations are assumed to be true only for the purposes of this motion to dismiss.

OAM's initial investment in RVO factored in such an agreement, as without it, RVO physicians could sell their practice to OAM and then turn around and quit to open a competing practice down the street, taking patients with them. As the Complaint details, the Physician Plaintiffs—who brought this lawsuit because they do not want the provision to apply to them—benefitted from the provision. Not just via the purchase price of RVO, but also when other former RVO doctors left OAM and were precluded from taking knowledge and patients gained from OAM to another practice down the road. (*Id*. ¶ 32.) Such a provision allowed for OAM's investment post-acquisition too, in the form of continued professional development of physicians and developing patient goodwill and loyalty, to name a few. Finally, as the Complaint makes clear, without such a provision, OAM risks that other orthopedic surgery providers struggling to attract patient volume will simply recruit away OAM's physicians and the patients/customers that follow those physicians, rather than engaging in marketing, promotion, and other efforts to attract and maintain patients.

Which is precisely what has happened here. Saint Mary's, a hospital and subsidiary of Plaintiff Trinity Health Michigan, contracts with orthopedic practices to provide on-call services and other orthopedic care at the hospital.[5] (*Id*. ¶ 31.) Saint Mary's and OAM had such an arrangement, though they did not enter into it directly; rather OAM inherited the arrangement from RVO in the acquisition. (*Id*. ¶¶ 31, 35.) In particular, the former RVO physicians that became employees of OAM, including the four Physician Plaintiffs, primarily carried on the relationship with Saint Mary's, including the on-call services contract. (*Id.*) Under that arrangement, Saint Mary's would derive revenue from the surgeries performed at the hospital, and Saint Mary's would

---

[5]     Saint Mary's also directly contracts with additional orthopedic surgeons through professional services contracts, an arrangement which does not include payments like those to OAM. (*Id.* ¶ 51.)

make "direct payments" to OAM. (*Id.* ¶¶ 19, 44.) In 2022, OAM requested a re-negotiation of the fee Saint Mary's pays OAM in exchange for on-call services, but Saint Mary's declined. (*Id.* ¶ 36.) Instead, Saint Mary's approached the Physician Plaintiffs about working for Saint Mary's directly, cutting out the "lucrative" fees to OAM that Plaintiffs complain of here. (*Id.* ¶ 44.)

But Physician Plaintiffs were precluded from contracting with Saint Mary's directly under their OAM employment agreements, and specifically the noncompete provision. Saint Mary's asked OAM to waive the noncompete provision, and instead OAM communicated its willingness to negotiate a "buy out" of the employment contracts, as is standard practice. (*Id.* ¶ 54.) But instead of negotiating a buy out in good faith, Saint Mary's, via Trinity Plaintiffs, simply "entered into employment contracts" with the Physician Plaintiffs, in contravention of the OAM employment agreement. (*Id.* ¶¶ 10, 80.) To intimidate OAM from pursuing its rights under that contract, Plaintiffs brought this lawsuit.

In addition to OAM's noncompete provision, Trinity Plaintiffs also challenge OAM's decision to terminate the on-call services agreement and related arrangements,[6] contending OAM is a monopolist and used its monopoly power to somehow shut Saint Mary's out of the market. The harm that Trinity Plaintiffs allege from this conduct is again lack of access to the Physician Plaintiffs, as those were the OAM doctors that serviced the on-call relationship. (*Id.* ¶¶ 8, 63.)

The Complaint establishes the plethora of business reasons behind OAM's decision to terminate, including the unworkable relationship between the parties since day one. (*Id.* ¶ 31.) In addition, Saint Mary's announced that it planned to start hiring orthopedic surgeons directly, which

---

[6]  Because the Plaintiffs Physicians are the primary supports for Saint Mary's orthopedic residency training program, Plaintiffs alleged that once the Plaintiff Physicians OAM employment ended, their contributions to this program will end as well. (*Id.* ¶¶ 67-69.) However as noted, since they filed their Complaint, Plaintiff Physicians have gone to work for Trinity Plaintiffs.

fundamentally changed the contractual relationship between Saint Mary's and OAM. (*Id.* ¶¶ 7, 19, 44.) Specifically, under the on-call contract, both entities would receive payment for performed surgeries, with a portion going to OAM and a portion going to Saint Mary's. (*Id.* ¶¶ 19, 36.) However, with its own employed orthopedic surgeons, Saint Mary's would be incentivized to direct surgeries toward the employed physicians and ***away from OAM physicians*** performing under the on-call contract. (*Id.*) Thus, when the Physician Plaintiffs that serviced the on-call contract announced their resignation from OAM, OAM subsequently notified Saint Mary's that it wished to terminate the on-call services agreement, effective the date of the Physician Plaintiffs' departure. (*Id.* ¶ 7.)

Since Plaintiffs filed their Complaint, Physician Plaintiffs have gone to work for the Trinity Plaintiffs. Trinity Plaintiffs are advertising this on their website and office locations. (Mutchnik Decl., Ex. 1-2.)

## STANDARD OF LAW

To survive a motion to dismiss, the complaint must present "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 547 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal,* 556 U.S. 622, 678 (2009). The court need not accept unwarranted factual inferences. *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir. 1987). The burden is on the movant to show that plaintiff has failed to state a claim. *Id.*

## ARGUMENT

### I.    Plaintiffs Lack Article III Standing to Bring Their Claims.

As a threshold matter, Plaintiffs' claims lack the Article III standing requirements of injury-in-fact and ripeness. Each "plaintiff must demonstrate standing for each claim[.]" *See, e.g.,*

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006). To establish standing, each plaintiff for each claim must show (1) that he or she suffered an injury-in-fact, (2) there is a causal connection between the injury and the conduct complained of, and (3) the injury will likely be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-561 (1992). An injury-in-fact must be "concrete and particularized"—it must "actually exist[]" and be "real," not "abstract." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016). Injury-in-fact must also be "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560.

A case or controversy must also be ripe for resolution, another component of the Article III standing inquiry. "Ripeness depends on whether the plaintiff's threatened injury is sufficiently imminent to warrant judicial action." *Pretasky v. MarineMax, Inc.*, 2002 WL 32345612, at *5 (W.D. Wis. Mar. 7, 2002). "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. U.S.*, 523 U.S. 296, 300 (1998).

Here, Plaintiffs have not established injury-in-fact or ripeness for their claims—neither their non-compete claims nor their on-call contract claims. Physician Plaintiffs' (who only bring non-compete claims) only purported injury is that OAM's non-compete precluded them from working at Saint Mary's, which harmed their practice. (Compl. ¶ 3.) Likewise, Trinity Plaintiffs' only purported injury from OAM's non-compete is that they could not employ the Physician Plaintiffs, causing decreased volume and lost profits. (*Id.* ¶¶ 8, 39, 63.) Trinity Plaintiffs' alleged injury from the on-call contract termination also arises entirely from their lack of access to the four Physician Plaintiffs that served the on-call relationship. Trinity Plaintiffs admit they would not be injured by the contract termination if the Physician Plaintiffs could work for Saint Mary's. (*Id.* ¶ 39 (alleging injury "will be avoided if [Physician Plaintiffs] can continue to work at Saint Mary's,

since they can continue to provide the on-call services previously provided through the OAM contract").)

Plaintiffs cannot satisfy Article III standing requirements because they cannot claim to have suffered any injury. Plaintiffs do not allege any conduct taken by OAM to date to enforce its non-competition provision or prevent Physician Plaintiffs from going to work for Saint Mary's. Indeed, since the Complaint has been filed, Physician Plaintiffs have in fact **begun work for Trinity Health Michigan and Saint Mary's.** Those entities are advertising the new doctors at their office locations as well as on their website. (Mutchnik Declaration, Ex. 1-2.) Because Plaintiffs cannot establish any concrete and ripe injury, they lack standing to bring their claims. *See, e.g., Geomatrix, LLC v. NSF Int'l,* 2022 WL 4369950, at *5 (E.D. Mich. Sept. 21, 2022) (dismissing for lack of standing where speculative injuries were not "ripe for review"); *Pretasky v. MarineMax, Inc.*, 2002 WL 32345612, at *5 (W.D. Wis. Mar. 7, 2002) (dismissing for lack of standing where defendant had not attempted to enforce non-compete and harm was "dependent on events that may not occur").

Plaintiffs' declaratory judgement claim (Count V) requests a declaratory judgment that OAM's noncompete is unenforceable under Michigan law. The Declaratory Judgement Act requires that a declaration of rights must be "in the case of an actual controversy within the court's jurisdiction." *Parker v. Parker*, 2023 WL 2572382, at *3 (N.D. Ill. Mar. 20, 2023). The actual controversy requirement "is coextensive with Article III's case-or-controversy requirement." *Id*. For a declaratory judgment action to be justiciable, it must not be "hypothetical, conjectural, conditional or based upon the possibility of a factual situation that may never develop." *Hillard v. First Fin. Ins.*, 968 F.2d 1214 (6th Cir. 1992). Plaintiffs' declaratory judgment action therefore fails for the same reasons, and the Court should dismiss that claim for lack of standing too. *See,*

*e.g.*, *True Freight Logistics LLC v. Glob. Tranz Enterprises, Inc.*, 2019 WL 11840292, at *2 (D. Ariz. Jan. 11, 2019) (dismissing declaratory judgment action for lack of standing because plaintiff failed "to allege any injury in relation to the nonsolicitation provision").

Finally, the Trinity Plaintiffs lack standing for their declaratory action claim for the separate reason that they are neither parties nor third-party beneficiaries to the non-compete provision under the contract about which they are seeking a declaration. *See Defiance Hosp. v. Fauster-Cameron, Inc.*, 344 F. Supp. 2d 1097, 1118 (N.D. Ohio 2004) (dismissing for lack of standing declaratory action regarding non-compete provision brought by prospective employer of employees bound by provision).

## II. Plaintiffs' Allegations Confirm That Plaintiffs Cannot Establish Antitrust Standing.

Separate from Article III standing, the allegations affirmatively show that Plaintiff cannot establish antitrust standing for each of their claims. "[A]ntitrust standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement we must dismiss it as a matter of law." *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007). Each Plaintiff must establish antitrust standing for each antitrust claim. *Id*. This is true for claims under both the Sherman Act and the Clayton Act (and, as discussed in Part VII, Michigan's parallel antitrust statute).

Antitrust standing is a critical inquiry that courts use to prevent plaintiffs from disguising routine business disputes as treble-damages antitrust lawsuits. *Id.* In addition to the specter of treble damages, "proceeding to antitrust discovery can be expensive," and without being checked, "the threat of that discovery expense will push cost-conscious defendants to settle even anemic cases before reaching those proceedings." *Twombly*, 550 U.S. at 559. Antitrust standing is a primary doctrine courts use to prevent this abuse.

Antitrust standing includes two inquiries: (1) whether the plaintiff has alleged antitrust injury, and (2) even if the plaintiff sufficiently alleges antitrust injury, whether the plaintiff is an efficient enforcer of the antitrust laws. *NicSand,* 507 F.3d at 450. Plaintiffs have failed to establish either prong. Indeed, Plaintiffs here are the precise type that antitrust standing doctrine is designed to weed out—disgruntled former business partners with a routine business dispute, wielding the antitrust treble-damages sword for leverage.

### A. Plaintiffs Cannot Establish Antitrust Injury.

Antitrust injury requires not only that plaintiffs' alleged injury is "proximately caused by defendants' allegedly illegal conduct," but also that it is "(1) injury of the type the antitrust laws were intended to prevent and (2) injury that flows from that which makes defendants' acts unlawful." *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 909 (6th Cir. 2003) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).

The Sixth Circuit is "aggressive in using the antitrust injury doctrine to bar recovery where the asserted injury, although linked to an alleged violation of the antitrust laws, ***flows directly from conduct that is not itself an antitrust violation***." *Valley Prod. Co.*, 128 F.3d at 402, 406 (emphasis added). This is precisely the problem with Plaintiffs' alleged injury here.

In particular, Sixth Circuit precedent requires dismissal where the alleged injury results from defendant's conduct "that it was lawfully entitled to take," such as actions taken under a contract. *In re Cardizem*, 332 F.3d at 914. For example, in *Valley Products*, the Sixth Circuit affirmed dismissal for lack of antitrust injury because—just like the injury here— the harm there "actually flowed, not from the anticompetitive effects of [the alleged restraint], ***but from the defendant's lawful termination of a vendor agreement***." *Id.* at 914 (discussing *Valley Products*) (emphasis added). As the *Valley Products* Court explained, "the loss of [] sales suffered by Valley upon cancellation of its vendor agreement flowed directly from the cancellation . . . the sale losses

14

would have been suffered as a result of the cancellation whether or not [defendant] had entered into the alleged [illegal agreements]." *Valley Products*, 128 F.3d at 404. Likewise, in *Hodges*, the Sixth Circuit affirmed dismissal for lack of antitrust injury because the injury "actually flowed not from the anticompetitive effects . . . but from the defendants' lawful refusal to grant plaintiffs access to their private property." *In re Cardizem,* 332 F.3d at 914 (discussing *Hodges v. WSM, Inc.,* 26 F.3d 36, 39 (6th Cir. 1994)). In other words, dismissal is required where it is "apparent from the face of the complaint that actual and unequivocally legal ***action by the defendant would have caused plaintiff's injury, even if there had been no antitrust violation***." *Id.* (emphasis added).

That is precisely the case here. Throughout the Complaint, Plaintiffs muddle together the six different plaintiffs and their alleged injuries without distinction, in a clear effort to mask the deficiencies of each. But when parsed apart as is necessary for the antitrust standing analysis, each and every injury that each Plaintiff claims is ***directly caused by the OAM's legal actions under its contracts***, and nothing more. Specifically, Plaintiffs allege that OAM's refusal to waive its noncompete provision[7] caused the following injuries: (1) the four Physician Plaintiffs make a vague and conclusory allegation devoid of factual support that their practices are "destroy[ed]" (Compl. ¶ 3.); (2) the Trinity Plaintiffs allege injury in the form of hypothetical lost profits and volume that they contend they would gain if they could hire the Physician Plaintiffs directly without regard to OAM's valid contract. (*Id*. ¶ 57.) Plaintiffs next allege that OAM's decision to terminate the on-call services contract with St. Mary's in light of the parties' unworkable

---

[7] This alleged conduct is the basis of the Section 1 claim (Count I) brought by all Plaintiffs. And together with the on-call contract termination, the basis of: the Section 2 claim (Count II) brought by Trinity Health Michigan and Trinity Health IHA; the Section 7 claim (Count III) brought by Trinity Health Michigan; and the Michigan state antitrust claim (Count IV) brought by each of those Plaintiffs.

relationship[8] injured Trinity Michigan in the form of lost volume and profits. (*Id.* ¶¶ 3, 7-9.) That's it. But none of this is antitrust injury; it is injury stemming from OAM's legal actions—using non-compete provisions in its employment contracts in connection with its purchase of RVO, and terminating vendor-type contracts that no longer serve OAM. Plaintiffs' alleged injuries would be exactly the same "even if there had been no antitrust violation." *In re Cardizem*, 332 F.3d at 914. That is, Plaintiffs could complain of the ***exact same harm absent any market power***, monopoly power, illegal agreement, monopolistic conduct, or anticompetitive acquisition under the antitrust laws.[9] This is because Plaintiffs have not brought an antitrust case at all, they have brought a business dispute dressed up as an antitrust case in order to intimidate OAM.

Because "Plaintiff[s] would have suffered the same injury without regard to the allegedly anticompetitive acts of Defendant[], Plaintiff[s] [have] not suffered an antitrust injury." *Hodges*, 26 F.3d at 38. Plaintiffs' Complaint should be dismissed on this basis alone. *Id.*

### B. Plaintiffs Cannot Establish the Remaining Requirements of Antitrust Standing Because They Are Not Efficient Enforcers of the Antitrust Laws.

Even if a plaintiff clears the antitrust injury hurdle (Plaintiffs here have not), antitrust standing imposes additional requirements. An antitrust plaintiff must also be "a suitable plaintiff to pursue the alleged antitrust violations and thus [] an 'efficient enforcer' of the antitrust laws." *Gatt Commcn's, Inc. v. PMC Assoc., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013) (internal citation omitted). Put another way, "[t]he existence of other parties that have been more directly harmed"

---

[8]    This conduct, in combination with the conduct stemming from the noncompete, forms the basis of the Section 2 claim (Count II) brought by Trinity Health Michigan and Trinity Health IHA; the Section 7 claim (Count III) brought by Trinity Health Michigan; and the Michigan state antitrust claim (Count IV) brought by those Plaintiffs.

[9]    Indeed, Plaintiffs' own allegations illustrate that the decision not to contract with Saint Mary's has ***nothing to do*** with market power or anticompetitive conduct. Plaintiffs allege "even the smaller physician groups in the community ***are largely committed to practicing at hospitals other than Saint Mary's***." (Compl. ¶ 109 (emphasis added).)

by the alleged conduct defeats antitrust standing. *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 111 n. 6.

To make this determination, the Sixth Circuit considers factors including "the existence of more direct victims of the alleged antitrust violation" and, relatedly, "the potential for duplicative recovery or complex apportionment of damages." *NicSand*, 507 F.3d at 460 (quoting *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,* 459 U.S. 519, 545 (1983)).

Here, Trinity Plaintiffs allege lost patient volume and profits and the Physician Plaintiffs vaguely reference harm to their practice. Plaintiffs **do not plead facts establishing an injury to competition at all**. To mask this fatal flaw, Plaintiffs also plead form allegations claiming speculative harm to the market and patients. For example, Plaintiffs vaguely allege "depressed quality" and "reduc[ed] overall competition" leading "to higher prices and poorer quality care." (Compl. ¶¶ 110, 125.)

These form allegations illustrate why Plaintiffs are not "efficient enforcers of the antitrust laws" here. If OAM's alleged conduct actually resulted in harm to competition or consumers, these harms would fall on consumer patients and their payors (insurers), not on Plaintiffs. As the Sixth Circuit explained in *Park Avenue Radiology*: "The parties directly harmed . . . are the healthcare consumers . . . and their third-party providers. Although Plaintiffs may ultimately suffer from a loss of patients and profits, their lost profits are derivative of the alleged harm inflicted on third parties." *Park Ave. Radiology Assocs., P.C. v. Methodist Health Sys., Inc.*, 198 F.3d 246 (6th Cir. 1999) (affirming dismissal).

But here, the impropriety of these Plaintiffs goes even further than the plaintiffs in *Park Avenue Radiology* and its kin. Here, the Physician Plaintiffs are alleged to be the **other half of the illegal agreement** that allegedly violates Section 1 of the Sherman Act. This plainly makes no

17

sense. As discussed, the Physician Plaintiffs benefited from the noncompete provision at every turn, until they did not want it enforced against them. And were the agreement at issue actually a Section 1 illegal agreement, there would certainly be more efficient enforcers of the antitrust laws than parties to that very agreement. If anything, the Physician Plaintiffs would be more appropriate as co-defendants than plaintiffs.

For these reasons, allowing Plaintiffs to pursue their claims would result in "the potential for duplicative recovery or complex apportionment of damages exists." *Id.* at 246. Moreover, even if Plaintiffs' conclusory allegations about harm to patients were true, they just establish that "a remedy on the basis of [the] allegations in this case is not likely to leave a significant antitrust violation undetected or unremedied." *Associated Gen. Contractors v. Carpenters*, 459 U.S. 519, 542 (1983). Plaintiffs' claims should be dismissed on this basis too.

## III.     Plaintiffs Failed to Plead a Plausible Relevant Antitrust Market.

Plaintiffs fail to allege a plausible relevant antitrust market, which also dooms their antitrust claims. Like antitrust standing, a plausible relevant antitrust market is a requirement for each of Plaintiffs' claims. Thus, Plaintiffs' failure to sufficiently plead this element is grounds for dismissal of their entire Complaint.

Plaintiffs must plead two market components: a relevant product market, and a relevant geographic market "so the district court can assess what the area of competition is, and whether the alleged unlawful acts have anticompetitive effects in that market." *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 437 (6th Cir. 2008).

The alleged relevant market must "'correspond to the commercial realities of the industry and be economically significant.'" *Monument Builders*, 524 F.3d at 733 (quoting *Brown Shoe Co.*

*v. United States,* 370 U.S. 294, 336–37 (1962)). The Sixth Circuit "affirm[s] grants of motions to dismiss on the basis of an insufficiently pled or totally unsupportable proposed market." *Id.*

### A.      Plaintiffs Failed to Plead a Plausible Geographic Market.

"The geographic market includes the geographic area in which consumers can practically seek alternative sources of the product, and it can be defined as the market area in which the seller operates." *Id.* Plaintiffs allege that Kent County, which includes the city of Grand Rapids and its environs, constitutes its own geographic market, and is the relevant geographic market here. (Compl. ¶ 100.)

On its face, a geographic market constrained to one county "makes no economic sense." *Matsuchita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). For example, to support their implausible market, Plaintiffs allege that Kent County residents are unwilling to drive more than one hour for orthopedic surgery. (Compl. ¶ 101.) But this allegation fails to take into account that for some residents of Kent County, orthopedic surgery options available in a neighboring county—options which the Complaint itself identifies and then artificially excludes— are geographically *closer* than the options in Grand Rapids.[10]

But even more strikingly, Plaintiffs' own allegations negate the plausibility of a single county as its own relevant market. For example, Plaintiffs allege that OAM has "29 orthopedic surgeons" and operates through its "three physicians' offices in the Grand Rapids metropolitan area as well as one office in Greenville [Michigan]." (*Id.* ¶ 18). Plaintiffs proceed to use their count

---

[10]   For the reasons discussed in the next section about Plaintiffs' alleged product market, Plaintiffs' alleged geographic market fails for the additional reason that it is defined based on practices or preferences of *patients and insurers*, rather than the relevant players in the market—orthopedic surgeons and the orthopedic surgery providers that compete for contractual arrangements with those surgeons. For example, Plaintiffs allege nothing about whether a one-county market makes sense in light of the distance orthopedic surgeons will travel to go to work.

of 29 orthopedic surgeons to allege OAM has market power in the purported Kent County market. (*Id*. ¶ 111.) But the Complaint leaves out the inconvenient fact that the city of Greenville (and thus the OAM Greenville office) **is not even in Kent County**, it is in the bordering county of Montcalm.[11] Yet Plaintiffs do not try to differentiate which of the 29 OAM physicians would be included in their market share calculation because they work in the Grand Rapids office, or subtract those who work in the Greenville office. As another example illustrating the fallacy of a one-county market, Plaintiffs reference the Physician Plaintiffs' work providing orthopedic services for athletes at Grand Valley State University (*Id*. ¶ 118), but similarly fail to mention that Grand Valley State's main campus, including all athletic programs and facilities, is located in Ottawa County.[12,13]

These examples highlight why a one-county geographic market makes no economic sense here. Common sense examples illustrate the problem too. For example, take a patient living in Kent City, Michigan, in Kent County. That patient could drive approximately 17 miles to Trinity Health Orthopedic Surgery- Grand Rapids or approximately three additional miles to Trinity Health Orthopedics in Muskegon. And for a patient living in the northwest side of Kent County, the difference between a drive to Trinity Health Orthopedic Surgery- Grand Rapids Campus versus a drive to Trinity Health Orthopedics- Muskegon is less than a mile. Yet Trinity Health Orthopedics- Muskegon would not be included in Plaintiffs' proposed geographic market because it is outside of Kent County.

---

[11]  Courts may take judicial notice of Google Maps. *See, e.g.*, *Betancourt v. Indian Hills Plaza LLC,* 2023 WL 2388553, at *1 n.1 (E.D. Mich. Mar. 7, 2023).

[12]  https://www.gvsu.edu/sportsfacilities/about-athletic-and-recreation-facilities-3.htm.

[13]  In deciding a motion to dismiss, a court make take judicial notice of an Internet website. *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 655 n.1 (6th Cir. 2005).

Another way to understand the fallacy of Plaintiffs' alleged geographic market is to consider how the parties market themselves. For example, Plaintiffs allege that OAM holds itself out as "west Michigan's most established Orthopedic Practice." (Compl. ¶ 17.) This is not the only time the Complaint inadvertently identifies "west Michigan" as the relevant area here. (*Id.* ¶ 12 ("IHA does not currently employ any orthopedic surgeons in western Michigan."); ¶ 22 ("OAM treats . . . patients who reside in other states but are visiting western Michigan.").) Other market participants identify the "west Michigan" market as well. Plaintiff Trinity Health Michigan notes that its "trusted orthopedists serv[e] Southeast and West Michigan."[14] When a patient looks for a physician on Trinity Health Michigan's website, physicians are identified as either serving "Southeast Michigan" or "West Michigan."[15] Trinity Health Michigan identifies its orthopedic surgeons located at Muskegon specifically as "some of West Michigan's leading experts."[16] Likewise, Trinity Health Michigan identifies its Grand Rapids orthopedic surgeons as "some of West Michigan's leading experts."[17] Likewise, Corewell Health, Saint Mary's alleged primary competitor, similarly divides itself into services based on Southeast Michigan, Southwest Michigan, and West Michigan.[18]

These examples, which are apparent from Plaintiffs' own allegations, belie the plausibility of Plaintiffs' gerrymandered geographic market. Because Plaintiffs' purported geographic market is "totally unsupportable" and does not "correspond to the commercial realities of the industry," Plaintiffs' claims should be dismissed. *Monument Builders,* 524 F.3d at 733.

---

[14]  trinityhealthmichigan.org/find-a-service-or-specialty-orthopedics. (*See* fn 11, *supra.*)

[15]  trinityhealthmichigan.org/find-a-doctor/

[16]  trinityhealthmichigan.org/location/trinity-health-orthpedics-muskegon.

[17]  trinityhealthmichigan.org/location/trinity-health-orthopedic-surgery-grand-rapids-campus.

[18]  corewellhealth.org.

### B. Plaintiffs Failed to Plead a Plausible Product Market.

In assessing the relevant product market, courts consider all products reasonably interchangeable by consumers for the same purposes, because the ability of consumers to switch to a substitute constrains a firm's ability to raise prices above the competitive level. *E.g., Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 628 (5th Cir. 2002).

Plaintiffs' alleged relevant product market fails as a matter of law. Plaintiffs appear to allege no less than eight relevant product markets, initially identifying four markets (inpatient orthopedic surgical services provided in hospitals; outpatient orthopedic surgical services provided at hospital-based facilities; outpatient orthopedic surgical services provided at ambulatory surgery centers; and the provision of professional orthopedic surgical services provided by physicians), and then apparently carving each of those into two separate markets—one for commercial insured patients, and one for Medicare Advantage patients. (Compl. ¶¶ 87-89, 93, 96-97.) But the Complaint's laundry list of markets is not relevant and can be easily rejected.

Plaintiffs again muddle together all the alleged conduct and claims, failing to differentiate which markets they contend are relevant for which alleged restraints. This alone dictates dismissal; Plaintiffs have the burden of alleging a relevant product market for *each* alleged restraint. They may not throw eight different alleged markets at the wall and hope something sticks, but that is precisely what they have done here. And in any event, each of their alleged markets fail because they are unsupportable and do not correspond with the economic realities of the industry. *Monument Builders,* 524 F.3d at 733.

Taking Physician Plaintiffs' claim regarding OAM's noncompete provisions first, each of Plaintiffs' proposed markets fail because Plaintiffs define these so-called markets by what *patients and insurers* view as substitutes. But Physician Plaintiffs' claim is that OAM uses its purported market power to restrain competition for Physician Plaintiffs' services in the *employment market*.

(Compl. ¶ 3.) When the alleged anticompetitive conduct restrains "a supplier market such as the employment market . . . the relevant market is one where employment positions are reasonably interchangeable with those offered by defendant." *Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 472 (6th Cir. 2005); *see also Todd v. Exxon Corp.*, 275 F.3d 191, 200-01 (2d Cir. 2001) (Sotomayor, J.). The pertinent analysis is the substitutability of defendant with other employment options from the perspective of the laborers—in this case, the market made up of entities competing to purchase orthopedic surgeon labor, either via an employment contract or a services contract. *Todd*, 275 F.3d at 201. Physician Plaintiffs do not plead anything at all about this market. For example, they do not allege anything about the participants in this market and the market power of each. Physician Plaintiffs' Section 1 claim fails on this basis. *Total Benefits Plan.*, 552 F.3d at 437 (affirming dismissal for failure to plead relevant market where "[t]here is no explanation of other companies with whom Plaintiffs or Defendants compete").

Moving on to the Trinity Plaintiffs' claims, those entities contend that OAM's conduct involving its noncompete and the on-call contract restrained their access to orthopedic surgeons. (*See, e.g.*, Compl. ¶ 119 (contending noncompete provisions "foreclose the ability to access talent").) Once again, Plaintiffs' eight proposed markets focused on what patients and insurers view as substitutes for their health care are wholly irrelevant. Here, the proposed market must describe the product OAM is allegedly restraining—access to orthopedic surgeons and substitutes for **that** product. *See, e.g.*, *Plymouth Whalers*, 419 F.3d at 472 ("Generally, a relevant market is one which includes products or services that are reasonably interchangeable with, as well as identical to, **defendant's product affected by the rule or regulation being challenged**.") (emphasis

added). Once again, Plaintiffs fail to plead any information about this market. Trinity Plaintiffs' claims should be dismissed on this basis. *Monument Builders,* 524 F.3d at 733.

But both the Physician Plaintiffs' and the Trinity Plaintiffs' purported markets fail for a more fundamental reason. Plaintiffs' own allegations ***identify interchangeable substitutes***, and then proceed to exclude those substitutes from their purported markets without justification. When the markets are viewed with those interchangeable substitutes accounted for, it becomes clear that Plaintiffs cannot possibly establish that OAM has market power in any relevant market. Plaintiffs' narrow framing of its purported markets in order to suggest OAM has market power warrants dismissal. *See, e.g., Apani*, 300 F.3d at 628 ("[A] proposed relevant market that clearly does not encompass all interchangeable substitute products . . . is legally insufficient, and a motion to dismiss may be granted."). But more critically, because Plaintiffs' own allegations identify these substitutes and then fail to account for them in the market analysis, Plaintiffs cannot replead around this fatal flaw. Plaintiffs have effectively pled themselves out of court, dictating that dismissal should be with prejudice.

More specifically, the Complaint confirms that, from the perspective of Trinity Plaintiffs, orthopedic surgeons that work in an inpatient surgery facility are substitutable with orthopedic surgeons that work, for example, in a physician practice, outpatient facility or ambulatory facility—they are in the same "pool." (Compl. ¶¶ 10, 19, 37, 51, 74, 111.) And from the perspective of Physician Plaintiffs, work at an inpatient surgery facility is substitutable with work at an outpatient surgery facility or physician practice. (*Id*.) In other words, the various types of orthopedic surgery providers described in the Complaint—physician groups, hospitals, surgery centers— ***all compete for orthopedic surgeons***. All of these relevant players must therefore be

included in the relevant market in order for the market to pass the plausibility test. *See Apani*, 300 F.3d at 628.

Yet Plaintiffs improperly carve up the alleged markets to exclude these substitutable entities, leaving just OAM, with an alleged 64% share, and one other competitor with a 23% share. (Compl. ¶ 26.) Moreover, despite identifying these additional participants in the Complaint, Plaintiffs plead no facts to justify their exclusion from the relevant markets. For example, Plaintiffs allege that Southwest Surgery Center is an outpatient orthopedic surgery center operating in Kent County, but seemingly fails to account for its presence in the relevant markets. (*Id*. ¶ 6.) According to its website, the center contracts with 14 orthopedic surgeons.[19] Similarly, Plaintiffs identify Corewell Health and UM Health as Saint Mary's competitors but fail to account for these participants in the markets at issue. (*Id*. ¶¶ 27, 107.)

These implausible exclusions justify dismissal. *Total Benefits Plan.*, 552 F.3d at 437 (affirming dismissal for failure to plead relevant market where "[t]here is no explanation of other companies with whom Plaintiffs or Defendants compete"). Moreover, without accounting for these players identified in the Complaint, Plaintiffs' product market allegations do not comport with "the commercial realities of the industry" at all. *Monument Builders*, 524 F.3d at 733. Plaintiffs' claims should be dismissed on this basis as well.[20]

## IV.    Trinity Plaintiffs Failed to Plead Monopoly Power or Barriers to Entry Necessary to State a Section Two Claim.

On top of these threshold issues, the Trinity Plaintiffs failed to state a Sherman Act §2 monopoly claim for additional reasons. Trinity Plaintiffs contend that OAM violated §2 by

---

[19]    southwestsurgical.org./about-us/our-physicians/specialty=orthpedic-surgery

[20]    *Accord Apani*, 300 F.3d at 633; *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437 (3d Cir. 1997).

restricting their access to orthopedic surgeons, both by declining to waive its noncompete provision and by terminating the on-call services agreement. To state a §2 claim, Trinity Plaintiffs must allege (1) monopoly power, usually shown through "a firm's possession of a dominant share of a relevant market that is protected by entry barriers," *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001), and (2) monopolistic conduct, i.e., that defendant maintained or achieved a monopoly through anticompetitive conduct. *See, e.g.,Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 409 (2004). Their claim fails to plead either prong.

### A. Trinity Plaintiffs Have Not Alleged OAM Has Monopoly Power.

Trinity Plaintiffs' § 2 claim fails at the outset because they do not allege that OAM has monopoly power. "Monopoly power under §2 requires . . . something greater than market power under §1," and showing that a defendant has market share above 50% is not enough. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992). Rather, the Sixth Circuit has suggested market ***share of "75-80% or greater" "should be regarded as the starting point"*** when assessing monopoly power. *Byars v. Bluff City News Co., Inc.*, 609 F.2d 843, 850 (6th Cir. 1979) (emphasis added). Even accepting Trinity Plaintiffs' alleged relevant market as plausible, Trinity Plaintiffs only allege that OAM has 64% share of the market. (Compl. ¶ 111.) Trinity Plaintiffs' monopoly claim thus fails as a matter of law.

Moreover, to infer monopoly power from a dominant market share, the relevant market must be "protected by entry barriers"—factors "that prevent new rivals from timely responding to an increase in price above the competitive level." *Microsoft*, 253 F.3d at 51. In a market without entry barriers, market share does not signal monopoly power because of the possibility of new entrants. *Id.* at 54.

Trinity Plaintiffs' only relevant allegations suggest that barriers to entry in the professional orthopedic surgery services market are high because recruitment of physicians can take

approximately 12 to 18 months. (Compl. ¶ 131.) But Trinity Plaintiffs' other allegations belie this assertion—for one thing, the Complaint alleges Saint Mary's recruited the Physician Plaintiffs in less time. (*Id*. ¶ 54.) Indeed, if providers expected that it would take 12 to 18 months to recruit an orthopedic surgeon, presumably the Trinity Plaintiffs would simply wait for the 12-month noncompete clause to expire rather than litigating frivolous antitrust claims. Moreover, the Complaint alleges that Plaintiff Trinity IHA would enter the market and employ its own orthopedic surgeons but for the noncompete, even though it does not currently employ any, suggesting low barriers for potential entrants. (*Id*. ¶¶ 13, 111.)

Thus, even if Trinity Plaintiffs ***could*** allege that OAM has monopoly power (they have not even tried), their own allegations establish such power would not be protected by barriers to entry.

### B. Trinity Plaintiffs Failed to Plead that OAM Engaged in Monopolistic Conduct.

Trinity Plaintiffs also fail to plead monopolistic conduct. Trinity Plaintiffs allege that OAM engaged in monopolistic conduct by declining to waive its noncompete and terminating its on-call agreement with St. Mary's. (*Id*. ¶ 150). But this is not monopolistic conduct at all. As discussed in Part II, enforcement of a noncompete or termination of a services contract could happen just as easily without any market power at all, let alone monopoly power.

Moreover, Trinity Plaintiffs' claim is premised on conduct that the Supreme Court and the Sixth Circuit have long recognized is perfectly lawful. Not even monopolists, which OAM is not, are "under a duty to cooperate" with other businesses. *Trinko*, 540 U.S. 398. Rather, "businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 448 (2009). Such freedom to conduct business extends to OAM's negotiation of a noncompete provision, as well as OAM's decision to terminate a services contract that no longer serves it.

Trinity Plaintiffs' form allegations that OAM's conduct "made no sense" absent an intent to monopolize and "involv[ed] a sacrifice of short term profits" (Compl. ¶ 45) are a halfhearted attempt to shoehorn their claim into the narrow exception to *Trinko*. But this tactic falls flat. *Trinko* outlines the rare exception to the general rule that businesses, even monopolists, have no duty to cooperate with other businesses.[21] To fit that exception, a plaintiff must show that a monopolist: (1) entered into a "voluntary . . . course of dealing with its rival" and subsequently terminated that prior, profitable course of dealing, and (2) that such conduct was "irrational but for its anticompetitive effect," for example because the monopolist "act[ed] without business reasons." *St. Luke's Hosp. v. ProMedica Health Sys., Inc.*, 8 F.4th 479, 486-487 (6th Cir. 2021). The Sixth Circuit is clear that such "refusal to deal" claims "face a steep and obstacle-laden climb" where "***far more claims are lost than won on this ground***." *Id.* (emphasis added).

Here, the Complaint tells us all we need to know about OAM's rational, valid business reason for terminating the on-call services arrangements with Saint Mary's. Several reasons, actually.[22] ***First***, according to the Complaint, Saint Mary's announcement that it intended to employ orthopedic surgeons directly would significantly change the relationship between OAM and Saint Mary's. Where the parties' previous arrangement was akin to a vendor relationship, with

---

[21] The *Trinko* Court had to identify an exception in the first place only because it was bound by the Supreme Court's earlier decision in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 427 U.S. 585 (1985). In that case, the Court made an exception to the otherwise consistent rule that businesses are under no duty to cooperate. But the *Trinko* Court and other decisions since *Aspen Skiing* have limited that holding to its unique facts. *Trinko*, 540 U.S. at 406. And the Supreme Court has consistently messaged that *Aspen Skiing* was ***"at or near the outer boundary of §2 liability***." *Id.* at 409 (emphasis added). In any event, the facts here come nowhere close to *Aspen Skiing* for the reasons discussed above.

[22] The facts here do not fit the first prong of the exception either. Rather than a "voluntary" prior course of dealing, OAM's prior course of dealing with Saint Mary's was an inherited artifact of its RVO acquisition. The Complaint also calls into question whether the arrangement remained profitable for OAM—OAM allegedly requested a renegotiation of payments under the contract and Saint Mary's declined. (Compl. ¶ 36.)

this change they would become something akin to competitors for surgery patients, with Saint Mary's benefitting from channeling surgeries away from OAM surgeons and toward its own employed orthopedic surgeons. (Compl. ¶¶ 7, 111.) The Sixth Circuit instructs that changed competitive conditions present valid business reasons for terminating a contract. *ProMedica*, 8 F.4th at 487, 488. **Second**, OAM identified a need to renegotiate the payment terms of the on-call contract, and Saint Mary's refused—a quintessential economic justification for electing to discontinue a contract. (Compl. ¶ 36.) **Third**, the allegations confirm the inherited, legacy contractual relationship was unworkable. (*Id*. ¶ 31.) Thus, after the Physician Plaintiffs that serviced the contract with Saint Mary's announced their resignation from OAM, OAM notified Saint Mary's of its intent to terminate, effective the date of the Physician Plaintiffs' departure. Trinity Plaintiffs cannot point to anything to suggest termination of a soured contractual relationship, particularly an inherited one, amounts to an antitrust violation.[23]

Nor is Trinity Plaintiffs' conclusory allegation that OAM's conduct "involv[ed] a sacrifice of short term profits" sufficient to survive dismissal. (*Id*. ¶ 45.) Trinity Plaintiffs do not allege any facts to support such a contention, and in fact, their own allegations establish the opposite is true. The Complaint confirms that OAM did not need its on-call services arrangement with St. Mary's— Trinity Plaintiffs allege OAM has arrangements with hospitals other than St. Mary's, and thus could shift volume in that direction. (*Id*. ¶¶ 17-18.) *See, e.g., ProMedica*, 8 F.4th at 488. Such a decision would make particular economic sense given the Complaint's confirmation that St. Mary's was unwilling to negotiate the economic terms of their contract. (Compl. ¶ 36.) Even in

---

[23] OAM's alleged conduct of declining to waive its noncompete provision fails to fit into the exception on both prongs. OAM never had a "prior course of dealing," for example there are no allegations that OAM used to allow hospitals to hire its departing physicians and then stopped. Nor can Plaintiffs suggest a lack of a business justification for declining to forego its noncompete agreement that it negotiated lawfully in the context of its purchase of RVO.

the absence of a volume shift, the Complaint also confirms that OAM had no business with St. Mary's prior to the RVO acquisition, and thus a termination of that legacy relationship with the departure of the remaining RVO-acquired physicians is simply a return to the status quo. (*Id.* ¶ 31.) Moreover, the Complaint also tells us that OAM is far from the only shop in town that does not have hospital privileges with St. Mary's: Spectrum Medical Group physicians contract with Corewell Health, and—tellingly—"even the smaller physician groups in the community are largely committed to practicing at hospitals other than Saint Mary's." (*Id.* ¶ 109.) Trinity Plaintiffs' attempt to use form allegations to fit into the narrow *Aspen Skiing* exception to this rule comes nowhere close. Trinity Plaintiffs' § 2 claim should be dismissed.

## V.     Plaintiffs Failed to Plead a Section One Claim.

Unable to state a §2 monopoly claim, all Plaintiffs try to shoehorn their allegations into the §1 framework by alleging that the noncompete clause is an agreement to restraint trade between OAM and the Plaintiff Physicians. But Plaintiffs' §1 claim fails too.

### A.     Plaintiffs Do Not Plead a Section One Agreement.

Section 1 of the Sherman Act requires a contract or agreement to restrain trade between two or more parties. *Guzowski v. Hartman*, 969 F.2d 211, 213 (6th Cir. 1992). The only agreement Plaintiffs can point to is the employment agreement between OAM and Physician Plaintiffs. (Compl. ¶ 141.) But this theory fails at the outset: the Sixth Circuit, in reliance on the Supreme Court's decision in *Copperweld Corp. v. Independent Tube Corp.*, has made clear that "***Section 1 . . . does not reach agreements between the officers of a corporation and its employees***."[24] *Guzowski,* 969 F.2d at 213. (emphasis added) (discussing *Copperweld*, 467 U.S. 752 (1984)).

---

[24]     The rationale behind *Copperweld* is illustrated in this case. As discussed above in Part II, Physician Plaintiffs are alleged to be the other half of the alleged illegal agreement here. In other words, their co-

The Sixth Circuit has previously affirmed denial of §1 claims involving noncompetes on this exact basis. *Borg-Warner Protective Servs. Cop. v. Guardsmark, Inc.*, 946 F. Supp. 495, 499 (E.D. Ky. 1996), aff'd, 156 F.3d 1228 (6th Cir. 1998).

This is consistent with other decisions analyzing non-compete clauses in employment contracts under §1 of the Sherman Act. *See, e.g.*, *GTE Data Servs., Inc. v. Elec. Data Sys. Corp.*, 717 F. Supp. 1487, 1493 (M.D. Fla. 1989) (granting judgment on the pleadings for Section One claim regarding non-compete clauses because corporation could not conspire with its employees); *Caremark Homecare, Inc. v. New England Critical Care, Inc.*, 700 F. Supp. 1033, 1035 (D. Minn. 1988) (similar); *Marshall v. Miles Laboratories*, 647 F. Supp. 1326 (N.D. Ind. 1986) (same).

This ends the inquiry for Plaintiffs' §1 claim. The claim should be dismissed. *Copperweld*, 467 U.S. 752.

## B. Plaintiffs Do Not Plead Anticompetitive Effects in a Relevant Market.

Plaintiffs also fail to allege anticompetitive effects of the agreement in a relevant market. "The foundation of an antitrust claim is the alleged ***adverse effect on the market***," not individual plaintiffs. *Warrior Sports, Inc. v. Nat'l Collegiate Athletic Ass'n*, 623 F.3d 281, 286 (6th Cir. 2010) (emphasis added). "The complaint must contain allegations as to how the market has changed or been damaged by the conspiracy." *Murray v. Chrysler Grp., LLC,* 2013 WL 5340782, at *4 (E.D. Mich. Sept. 23, 2013).

As discussed with respect to antitrust standing, Plaintiffs' allegations of harm focus entirely on harm to Plaintiffs, rather than to the market. Plaintiffs' conclusory allegations that OAM's conduct "would also harm competition" and would "likely lead to higher prices and poorer quality

---

plaintiffs are accusing them of being co-conspirators in a federal antitrust conspiracy, which simply defies logic.

care" is insufficient. (Compl. ¶¶ 110, 125.) Conclusory allegations of market harm are not enough to plead anticompetitive effects. *Warrior Sports*, 623 F.3d at 286.

But Plaintiffs don't just insufficiently plead—they ***cannot*** plead anticompetitive effects as a matter of law. Because the Sixth Circuit has explicitly recognized that ***noncompete clauses like the one at issue here do not harm competition*** nor do they "run afoul of either federal or Michigan antitrust policy." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 545, 551 (6th Cir. 2007). Beyond that, courts across the country routinely recognize that noncompete provisions in the context of a sale of a business, like the provision at issue here, do not violate the antitrust laws.[25] *See, e.g., Eichorn v. AT&T Corp.*, 248 F.3d 131, 145 (3d Cir. 2001) (collecting cases). As discussed above, RVO's physicians and the concomitant noncompete provision were factored into the purchase price of that business. One could imagine how the value of the RVO asset would swiftly drop to zero if RVO physicians sold their practice to OAM and after the sale was final, left OAM to start a new practice or join an existing one, taking the assets OAM had just purchased (including patients and know-how) with them. Indeed, the Complaint lays out how the Plaintiff Physicians ***benefitted extensively*** from the noncompete provision they now challenge, including when other RVO physicians left OAM but were precluded by the noncompete from taking Plaintiff Physicians' patient volume or confidential information with them. (Compl. ¶ 32.) Even outside of the purchase of a business, the Sixth Circuit has held that noncompete clauses with duration and geographical parameters like those alleged here do not

---

[25] Even the Federal Trade Commission, which as the Complaint notes issued a Notice of Proposed Rule Making regarding certain types of noncompetition clauses, has recognized the need for such provisions in connection with the sale of a business. *See* 16 CFR § 910.3 (explicitly noting that the FTC's Proposed Rule regarding noncompetition clauses "shall not apply to a non-compete clause that is entered into by a person who is selling a business entity or otherwise disposing of all the person's ownership interest in the business entity, or by a person who is selling all or substantially all of a business entity's operating assets . . .").

violate the antitrust laws because they are designed to protect the employer's legitimate interests.[26] *Certified Restoration*, 511 F.3d at 545.

Plaintiffs' anticompetitive effect allegations fail, and their §1 claim should accordingly be dismissed. This is consistent with other federal courts that have considered noncompete clauses in employment contracts under the antitrust laws. *See, e.g., Claudill v. Lancaster Bingo Co.*, 2005 WL 2738930, at *9 (S.D. Ohio Oct. 24, 2005) (dismissing §1 claim against employer noncompete for failure to allege anticompetitive effects).

## VI. Trinity Health Michigan's Clayton Act Section 7 Claim is Time Barred.

Plaintiff Trinity Health Michigan also brought a Clayton Act §7, alleging that the 2018 merger with RVO was itself an antitrust violation and allowed OAM to insist on noncompete agreements and terminate the on-call contract, injuring Saint Mary's. Section 7 prohibits acquisitions that "substantially lessen competition or tend to create a monopoly." 15 U.S.C. § 18. To survive dismissal of a Section 7 claim, a plaintiff must plead market power by the defendant and anticompetitive effects caused by the acquisition. This claim is based on the exact same alleged conduct as the §1 and §2 claims, and therefore fails on each basis discussed above. But on top of that, the §7 claim can be dismissed swiftly because it is time-barred.

A "Section 7 cause of action challenging an acquisition accrues at the time of the merger or acquisition, and there is a four-year statute of limitations." *Z Technologies Corp. v. Lubrizol Corp.*, 753 F.3d 594, 604 (6th Cir. 2014). The Complaint confirms that OAM's acquisition of RVO

---

[26] Likewise, Michigan's state antitrust statute explicitly provides that non-compete provisions are lawful under the state antitrust law so long as the agreement "is reasonable as to its duration, geographic area, and the type of employment or line of business," MCLA 445.774a, all criteria established here on the face of the Complaint as discussed above. (*See* Compl. ¶ 52.)

occurred in 2018, more than four years from the filing of the Complaint. (Compl. ¶ 29.) The Court

should dismiss Plaintiffs § 7 claim on this basis. *Z Technologies*, 753 F.3d at 594.

## VII. Plaintiffs' State Antitrust Claims Similarly Fail.

Plaintiffs claim that the same conduct also violates the Michigan state antitrust statute. But

Plaintiffs' "state law claims rise and fall with [their] federal antitrust claims." *Id.* at 605 ("Michigan

has expressly indicated that 'in construing all sections" of the state antitrust act, "the courts shall

give due deference to interpretations given by the federal courts to comparable statutes.'") (quoting

Mich. Comp. Laws §445.781). Plaintiffs' state law antitrust claims should be dismissed along with

their federal claims.

## VIII. Plaintiffs' Declaratory Judgment Claim Should be Dismissed.

Plaintiffs also request a declaratory judgment that OAM's noncompete provision is

unenforceable under Michigan state law MCLA 445.774a. At the outset, the Court should dismiss

this claim because Plaintiffs' federal claims fail and the Court should decline to exercise its

supplemental jurisdiction. *See, e.g., Wright v. County of Mescota*, 2018 WL 4923906, at *1 (W.D.

Mich. Oct. 10, 2018) (dismissing federal claims and declining to exercise supplemental jurisdiction

over state claims). Beyond that, Plaintiffs have failed to establish Article III standing to bring this

claim as discussed in Part I. Moreover, Plaintiffs fail to state a claim because, as discussed in detail

in Part V, the Sixth Circuit has explicitly held that noncompete provisions with the same duration,

geography, and purpose limitations that Plaintiffs allege here do not violate MCLA 445.774a as a

matter of law. *See, e.g.*, *Certified Restoration* 511 F.3d at 551. The claim should be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court dismiss

Plaintiffs' claims in their entirety pursuant to Rules 12(b)(1) and 12(b)(6). Because amendment

will not enable Plaintiffs to submit a legitimate claim, OAM respectfully requests that the Court

dismiss with prejudice. *See, e.g., Found for Interior Design Educ. Rsch. v. Savannah Coll. of Art & Design*, 73 F. Supp. 2d 829, 840 (W.D. Mich. 1999), aff'd, 244 F.3d 521 (6th Cir. 2001).

Dated: March 24, 2023

Respectfully submitted,

/s/ *James H. Mutchnik*
James H. Mutchnik
Daniel E. Laytin
Kate Guilfoyle
jmutchnik@kirkland.com
dlaytin@kirkland.com
kate.guilfoyle@kirkland.com
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, IL 60654
Telephone: +1 312 862 2000
Facsimile: +1 312 862 2200

*Attorneys for Defendant Orthopaedic*
*Associates of Grand Rapids, P.C.*
*d/b/a Orthopaedic Associates of Michigan*

## CERTIFICATE OF COMPLIANCE

In accordance with Local Rule 7.2(b)(ii), I certify that this Brief complies with the wordcount limitation set forth in Local Rule 7.2(b)(i). According to my word-processing system, Microsoft Word 2022, this Brief contains 10,799 words, excluding those portions of the Brief exempted by the Rule.

*/s/ James H. Mutchnik*
James H. Mutchnik
Daniel E. Laytin
Kate Guilfoyle
jmutchnik@kirkland.com
dlaytin@kirkland.com
kate.guilfoyle@kirkland.com
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, IL 60654
Telephone: +1 312 862 2000
Facsimile: +1 312 862 2200

*Attorneys for Defendant Orthopaedic
Associates of Grand Rapids, P.C.
d/b/a Orthopaedic Associates of Michigan*

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2023, a true and correct copy of the foregoing document, **DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**, was electronically filed and served upon counsel of record via the Court's CM/ECF System.

*/s/James H. Mutchnik*

James H. Mutchnik
Daniel E. Laytin
Kate Guilfoyle
jmutchnik@kirkland.com
dlaytin@kirkland.com
kate.guilfoyle@kirkland.com
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, IL 60654
Telephone: +1 312 862 2000
Facsimile: +1 312 862 2200

*Attorneys for Defendant Orthopaedic*
*Associates of Grand Rapids, P.C.*
*d/b/a Orthopaedic Associates of Michigan*